**Charles Franklin GARRETT, Appellant,**

v.

**PHILLIPS MILLS, INC., Appellee.**

**No. 82–2037.**

United States Court of Appeals,
Fourth Circuit.

Argued June 6, 1983.
Decided Nov. 23, 1983.

William W. Walker, Winston-Salem, N.C. (C. Thomas Ross, Craige, Brawley, Liipfert & Ross, Winston-Salem, N.C., on brief), for appellant.

R. Cameron Cooke, Greensboro, N.C. (Christine P. Richards, Graham, Cooke, Miles & Bogan, Greensboro, N.C., on brief), for appellee.

Before SPROUSE and ERVIN, Circuit Judges, HAYNSWORTH, Senior Circuit Judge.

SPROUSE, Circuit Judge:

This is an age discrimination case [1] brought by Charles F. Garrett against Phillips Mills, Inc. (Phillips).[2] Garrett, a salesman with Phillips, was terminated at age fifty-seven in May 1979. Following Garrett's testimony at trial, the district court found that Garrett, at the time of his termination, was not an employee, but provided his services to Phillips as an independent contractor. The court, for that reason, dismissed Garrett's suit as falling outside the scope of the ADEA. We affirm.

Phillips is in the business of selling upholstery fabrics to manufacturers throughout the United States and Canada. Garrett was hired as a salesman in 1949, and sold Phillips's fabrics in the High Point, North Carolina territory. He was promoted to vice-president in 1957, but resigned from that position in 1972. Garrett continued as a salesman with Phillips until his termination in 1979.

Garrett sold fabrics for Phillips from 1949 to 1970 under an oral agreement. He was paid a salary and a small percentage of net sales for the territory in which he worked. Phillips withheld taxes and social security payments from Garrett's salary. All of Garrett's business-related expenses were paid by Phillips. Phillips also provided Garrett with medical insurance coverage and contributed to a retirement plan for him.

From April 1, 1970, until his termination, Garrett provided his services to Phillips under a written agreement. The contract stated that Garrett's compensation would consist of "straight commissions" based solely on his sales performance.[3] Garrett was responsible for withholding his income and social security taxes, and Phillips was no longer obligated to pay Garrett's expenses. Phillips ceased to pay for Garrett's medical insurance premiums, and closed Garrett's retirement account after paying him the accumulated proceeds.

Garrett's selling activities, both before and after the written agreement, were essentially unsupervised. He had complete control over his working hours and vacation days. He reported to Phillips solely at his own discretion. Although Phillips sometimes made suggestions concerning methods of selling fabrics, Garrett was never required to follow the suggestions. He testified that he had personally developed a good technique for selling and had tailored varying approaches for different customers. Garrett also selected the accounts in the High Point territory he wished to handle, and was not required to sell exclusively for Phillips. Garrett had access to Phillips's main offices and some of its services, but was required to pay for such expenses as long distance telephone calls.

Garrett argues on appeal that the district court erred in finding that he was not an employee.

I

Section 4(a)(1) of the ADEA, 29 U.S.C. § 623(a)(1), provides:

It shall be unlawful for an employer— to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.

A plain reading of the ADEA indicates that an "individual" only has a cause of action under this provision if he is an "employee" at the time of his termination. *Hickey v. Arkla Industries, Inc.*, 699 F.2d 748 (5th Cir.1983); *EEOC v. First Catholic Slovak*

---

1. The Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–34 (1976 & Supp. V 1981).

2. Phillips Mills was named originally "Phillip-Davis, Inc." but renamed on January 1, 1979, as part of a reorganization of the company.

3. The agreement provided for a draw against his earned commissions of $2,000.00 per month.

*Ladies Association,* 694 F.2d 1068 (6th Cir. 1982), *cert. denied,* —— U.S. ——, 104 S.Ct. 80, 78 L.Ed.2d 90 (1983). *See also Cobb v. Sun Papers, Inc.,* 673 F.2d 337 (11th Cir.1982); *Lutcher v. Musicians Union Local 47,* 633 F.2d 880 (9th Cir.1980) (Title VII cases construing the term "individual" to mean "employee.")[4]

■ Determining who is an "employee" under the Act, however, is an involved question. The ADEA simply defines "employee" as "an individual employed by any employer." 29 U.S.C. § 630(f). We have not previously considered this issue, but are convinced that whether an individual is an employee in the ADEA context is properly determined by analyzing the facts of each employment relationship under a standard that incorporates both the common law test derived from principles of agency and the so-called "economic realities" test first announced in *Bartels v. Birmingham,* 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. 1947 (1947). The same method was followed recently by the United States Court of Appeals for the Third Circuit when faced with the identical issue. *EEOC v. Zippo Manufacturing Company,* 713 F.2d 32 (3d Cir.1983).

The common law standard traditionally used when deciding whether an individual can claim employee status emphasizes the importance of the employer's control over the individual. *Cobb v. Sun Papers, Inc.,* 673 F.2d 337. In *Bartels,* however, the Supreme Court decided that the common law "right to control" test was too rigid to serve as a useful tool in deciding employee status in cases arising under remedial social legislation. The Court in *Bartels* formulated a test which focused on the "economic realities" of the employment relationship.

Obviously control is characteristically associated with the employer-employee re-

lationship, but in the application of social legislation employees are those who as a matter of economic reality are dependent upon the business to which they render service. In [*United States v. Silk,* 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947)], we pointed out that permanency of the relation, the skill required, the investment in the facilities for work, and opportunities for profit or loss from the activities were *also factors* that should enter into judicial determination as to the coverage of the Social Security Act. It is the total situation that controls.

*Bartels,* 332 U.S. at 130, 67 S.Ct. at 1549 (emphasis added).

Although the "economic realities" test continues to have general applicability in the interpretation of certain remedial statutes,[5] most courts deciding the issue of employee status in Title VII cases[6] have utilized a combination of both the "economic realities test" and the common law right-of-control test. *Cobb v. Sun Papers, Inc.,* 673 F.2d 337; *Spirides v. Reinhardt,* 613 F.2d 826 (D.C.Cir.1979). *See also EEOC v. Zippo Manufacturing Co.,* 713 F.2d 32; *Hickey v. Arkla Industries, Inc.,* 699 F.2d 748 (age discrimination cases that discuss both tests). In *Zippo,* Judge Higginbotham traced the development of the meaning of the term "employee" as it is used in various federal statutes, paying particular attention to the conceptual affinity of the ADEA with both the FLSA and Title VII. Concluding, as has the Supreme Court, that the substantive "prohibitions of the ADEA were derived *in haec verba* from Title VII," 713 F.2d at 38, Judge Higginbotham reasoned that the test applied in Title VII cases was appropriate for resolving employee status issues in ADEA cases. This was the approach taken by the district court in the

---

4. 42 U.S.C. § 2000e–2(a)(1) (1976 & Supp. V 1981) [Title VII § 703(a)(1)]. The operative language of this subsection is identical to that contained in the ADEA, 29 U.S.C. § 623(a)(1). It provides:

It shall be an unlawful employment practice for an employer—to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions,

privileges of employment, because of such individual's race, color, religion, sex, or national origin.

5. *E.g.,* Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201–19 (1976).

6. 42 U.S.C. §§ 2000e to 2000e–17 (1976 & Supp. V 1981).

case *sub judice* and we agree it is the proper one.

■ Under this test, control is still the most important factor to be considered, but it is not dispositive. *Id.* at 37. Other important considerations include:

(1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; *i.e.,* by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.

*Spirides v. Reinhardt,* 613 F.2d at 832.

## II

■ Applying these principles to the facts found by the district court, we cannot say that the court erred in concluding that Garrett was an independent contractor and not an employee.

Phillips and Garrett, in their written agreement, expressly provided that Garrett was not to be an employee of Phillips. Garrett's performance under the agreement supports the conclusion that his independent contractor status was not merely a creation of the formal document, but that the status was recognized in the actual working relationship. Garrett was largely independent of Phillips's control. He was not required to account for his daily activities. He was not expressly prohibited from selling products of other companies. Garrett chose his own working hours, and his method of selling was essentially unsupervised. Although he was evaluated by company management, he rejected most of Phillips's suggestions for change in his sales approach. He paid his own operating expenses. Garrett's opportunity for profit was unlimited, being governed solely by his sales performance. Indeed, he testified that he had determined that within two years of selling under the written agreement, he would exceed his draw against commissions. The relationship was treated by both Phillips and Garrett as that of an independent contractor for tax purposes. Garrett was responsible for withholding his own income and social security taxes. He filed his tax return as a self-employed individual, not as an employee. Garrett personally established a Keogh Retirement Plan which, by its terms, is limited to self-employed individuals. Finally, Garrett's stated reason for his resignation as vice-president in 1972 was that "[t]his action is taken ... to remove any doubts concerning my position as an independent contractor, which I became in April, 1970."

The district court carefully considered the actual circumstances of the work relationship in making these subsidiary findings of fact concerning Garrett's status. Since we conclude that these findings are not clearly erroneous, we cannot disturb them. The district court concluded from its findings that Garrett was an independent contractor at the time of his termination. In reaching this result, the court gave detailed consideration to the relevant factors that distinguish an employee from an independent contractor, including the degree of control exercised by Phillips over Garrett, the intent of the parties, and the source of Garrett's benefit package. Factually, this is indeed a close case, but we can find no error in either the approach the district court followed, or in the ultimate conclusion it reached predicated on its findings of fact. *See Hickey,* 699 F.2d at 752–53; *Spirides,* 613 F.2d at 832.

AFFIRMED.