**Richard T. DERTHICK, and Derthick Associates, Inc. Plaintiffs,**

v.

**BASSETT–WALKER, INC., and VF Corporation, Defendants.**

**Stanley ROBBINS, and Stan Robbins & Associates, Inc. Plaintiffs,**

v.

**BASSETT–WALKER, INC., and VF Corporation, Defendants.**

**SLAYTON ASSOCIATES, INC., Plaintiff,**

v.

**BASSETT–WALKER, INC., and VF Corporation, Defendants.**

**Civ. A. Nos. 94–0026–D, 94–0027–D, and 94–0028–D.**

United States District Court, W.D. Virginia, Danville Division.

May 18, 1995.

513

Stephen Garland Bass, Carter, Craig, Bass, Blair & Kushner, P.C., Danville, VA, Arthur M. Wisehart, New York City, for Derthick Associates, Inc., Richard T. Derthick.

James A.L. Daniel, Daniel, Vaughan, Medley & Smitherman, P.C., Danville, VA, Martha B. Perkowski, James M. Powell, Brian M. Freedman, Haynsworth, Baldwin, Johnson and Greaves, P.A., Greensboro, NC, for Bassett–Walker Inc., VF Corporation.

## MEMORANDUM OPINION

KISER, Chief Judge.

Plaintiffs have sued defendants Bassett–Walker and its parent VF Corporation for breach of contract and other claims arising from defendant Bassett–Walker's restructur-

ing and elimination of commissioned sales representatives in 1989. Bassett–Walker is a manufacturer of fleece wear (such as sweatshirts and jogging pants). Since the fall of 1984 it has been a wholly owned subsidiary of VF Corporation, based in Pennsylvania. Plaintiffs were commissioned sales representatives for Bassett–Walker until their termination. They claim that they were wrongfully terminated based on a contractual arrangement with Bassett–Walker that allegedly provided for termination only for cause. They also claim a right in continuing commissions generated from accounts they developed. In addition, individual plaintiffs in the first two cases claim that defendants violated the Age Discrimination in Employment Act, 29 U.S.C. 621–34, (ADEA) by terminating them. Jurisdiction is proper under that act and under 28 U.S.C. § 1332.

The cases were first filed in 1990 and 1991 in the Southern District of New York. After some delay, they were finally transferred to this Court in April 1994. They are connected cases and have been consolidated for the purposes of discovery and dispositive motions but not for trial. I too will consolidate them for the purposes of this opinion. The parties are now before me on the defendants' motions for summary judgment. The issues have been fully briefed and argued and are now ripe for disposition. For the reasons expressed below, I will grant defendants' motions.

### I. Facts

#### A. Complaints

1. *Derthick*, filed August 20, 1990[1]

Richard Derthick, an Ohio resident (and his company Derthick & Associates, Inc., also a plaintiff), was employed by Bassett–Walker as a commissioned sales representative for retail and wholesale accounts beginning in 1968. He alleges the following causes of action: (1) violation of the ADEA; (2) breach of contract; (3) tortious interference with customers and sales associates; and (4) conversion. Plaintiffs seek reinstatement and compensatory, liquidated and punitive dam-

1. Papers and correspondence pertaining to all three cases are filed in *Derthick*.

ages as well as damages for pain and suffering, mental anguish and emotional distress.

### 2. *Robbins,* filed November 20, 1990

Stan Robbins, a Massachusetts resident (and his company Stan Robbins & Associates, a Massachusetts corporation), was employed as a commissioned salesperson in 1965 by Bassett–Walker. He was terminated as a commission salesman as of December 1, 1989, and was offered a position as a salaried salesman. He accepted the position and learned that he would have to relocate to New York City. He was not ultimately employed by Bassett–Walker. He alleges the following causes of action: (1) violation of the ADEA; (2) breach of contract; (3) tortious interference with business relations; (4) conversion; (5) wrongful termination; and (6) unfair trade practices in violation of Massachusetts law. Plaintiffs seek reinstatement, compensatory and punitive damages.

### 3. *Slayton Associates, Inc.,* filed June 7, 1991

Plaintiff Slayton Associates, Inc. (and its predecessor Slayton & Associates) was employed by Bassett–Walker as a commissioned sales representative beginning in 1967. Plaintiff was terminated effective December 1, 1989. It states the following causes of action: (1) breach of contract; (2) tortious interference with business relations; (3) conversion; (4) violation of the Illinois Sales Representative Act; and (5) violations of the Illinois Deceptive Trade Practices Act and the Illinois Consumer Fraud and Deceptive Business Practices Act. Plaintiff seeks compensatory and punitive damages.

### B. Summary of Facts.

### 1. Background on Plaintiffs

In 1968, Derthick and an associate, Bob Dykstra (later an employee of Derthick & Associates), agreed to sell Bassett–Walker fleecewear in Michigan for a 2½% commission. Certain Michigan accounts were excluded from his territory as "house" accounts. The parties agreed that Derthick could represent other manufacturers' lines. There was no written agreement. In addi-

tion, there was no discussion about the duration of the relationship. Derthick depo. at 67–78. According to Derthick, the parties did not discuss how Bassett–Walker could terminate the relationship, although Derthick understood that he was free to end it at any time. *Id.* at 80, 92. In 1970, Derthick incorporated Derthick & Associates in Michigan. In 1981, when Bassett–Walker expanded his territory to include Ohio, he reincorporated in Ohio. His territory was later expanded to include western Pennsylvania. Derthick's initial decision to incorporate was based on advice of his personal accountant to gain personal tax advantages. From its incorporation in 1970, Derthick & Associates has deducted and paid payroll taxes for its employees.

Stan Robbins became a salesman in 1957, working first for a sales representative. He met with James Montgomery, Bassett–Walker's Vice President of Sales, in Martinsville, Virginia (Robbins depo. at 17–18, 89). It was agreed that he would represent Bassett–Walker in the six New England states and receive a 2½% commission. Part of the agreement was that he could continue to represent other lines. There was no written agreement. He understood that he would remain employed by Bassett–Walker as long as he performed satisfactorily. In 1977, Robbins incorporated Stan Robbins & Associates in Massachusetts based on advice from his attorney. He is and has always been the president and is treasurer. He is paid a monthly salary by Stan Robbins & Associates as is his wife who works as a bookkeeper.

Around 1953, Wendel Slayton, Jr., formed a partnership with his father and two others, primarily to sell textiles. The business grew and was incorporated in Illinois in 1970. In 1966, he and Jim Stanley, a partner, initiated negotiations with James Montgomery to allow Slayton Associates (t/k/a Slayton & Associates) to represent Bassett–Walker in the midwest. It was originally agreed that they would receive a 2% commission on all orders but Sears and Kresge (K Mart), on which the commission would be 1½%. They agreed that Slayton Associates could continue to represent other manufacturers. Slayton

depo. at 23–26. The parties did not discuss the duration of the relationship or how it could be terminated, though Slayton understood that there was no restriction on how Slayton Associates could terminate the relationship. *Id.* at 27–28. Slayton Associates' territory was expanded in the late 60s and early 70s (part of its territory was also reassigned to Derthick). It developed a Strategic Sales Plan for the years 1987–1992 outlining its efforts to help Bassett–Walker grow in the changing fleece market. Slayton depo. at 162–64; ex. 12. The plan detailed Slayton Associates' efforts to develop accounts, penetrate the sporting goods field, and open two branch offices (in Minneapolis and St. Louis). Bassett–Walker did not require the plan; instead Slayton Associates independently drafted it to demonstrate its commitment to Bassett–Walker. Slayton depo. at 147.

2. Bassett–Walker's Relationship with Derthick and Robbins

Bassett–Walker compensated plaintiffs solely on commission, first in checks made out personally to the individual plaintiffs and then to their business. Bassett–Walker reported this income on a 1099, not a W–2, and did not withhold taxes (it withheld other amounts due). Derthick & Associates maintained its own office space, provided its own supplies, employed its own secretaries, and employed and paid sales people, including Bob Dykstra, Sam Impastato, Michael Denome, John Turner, and Rick Derthick (plaintiff's son). It paid its individual sales people a percentage of their sales, and reported this on a 1099. It also maintained life insurance policies on its salesmen. Its salesmen were responsible for their own sales expenses.

Robbins first worked out of his house and then moved into commercial office space. Stan Robbins & Associates leased the space in its name, provided its own office equipment and paid its own operating expenses and telephone bills. Several salespeople worked as salaried employees over the years, with salaries reported on W–2 forms. They were not paid by Bassett–Walker. Robbins was solely responsible for hiring and firing his employees and did fire several for various reasons. Stan Robbins & Associates reimbursed its salesmen for travel expenses, maintained health insurance and a profit-sharing plan, and deducted and paid payroll taxes.

None of the salespeople or employees of the plaintiffs participated in Bassett–Walker's health insurance plan, dental plan, pension plan, disability plan, or any of the other benefit plans available to employees of Bassett–Walker. Derthick depo. at 140–45; Robbins depo. at 95–96. Bassett–Walker never provided workers' compensation insurance for Derthick, Robbins or any other employee of Derthick & Associates or Stan Robbins & Associates. Derthick depo. at 27. Derthick asserts that Bassett–Walker offered Derthick Associates a benefits package but it was declined. Derthick affid. ¶ 96. He elsewhere contradicted this by testifying that he felt Bassett–Walker should have offered them its benefit plans and paid payroll taxes. Derthick depo. at 425. Bassett–Walker did not reimburse plaintiffs' expenses for sales calls, mileage or entertainment. It only reimbursed the plaintiffs for out-of-pocket expenses when one of their sales people attended sales or client meetings in Martinsville. In those cases, Bassett–Walker paid Derthick & Associates or Stan Robbins & Associates which in turn reimbursed the individual. Robbins depo. at 83–84.

Starting in 1985, Derthick & Associates purchased all sample products used to promote Bassett–Walker's products directly from Bassett–Walker. If Stan Robbins & Associates' customers did not pay for samples, 50% of the cost was charged against their commission. They were required to pay the markdown allowance to Hills Department Stores, that was negotiated between Hills, Bassett–Walker and Stan Robbins & Associates. In 1989, this came to $2000. Robbins depo. at 261–63.

Derthick kept his own schedule, determined his own hours, vacation time, and scheduled his own appointments with customers. Bassett–Walker required that he keep a weekly log of sales calls, but did not set a minimum or maximum. Derthick testified that starting in 1988, Bassett–Walker had to approve their vacation time (it issued

a letter stating that no vacation would be scheduled until further notice). Derthick depo. at 279–80.

All orders written were subject to approval by Bassett–Walker, and the order form noted that orders could only be accepted by Bassett–Walker. Bassett–Walker set all prices and terms; plaintiffs could not alter them.

### 3. Sale of Other Manufacturers' Products

Derthick & Associates did not sell Bassett–Walker products exclusively. Derthick & Associates also represented several hosiery manufacturers, a towel manufacturer, and manufacturers of thermal underwear, rugs, jackets, slippers and scarves. Bassett–Walker knew of the other lines, and only requested that plaintiffs not represent competing lines of fleece.

Stan Robbins & Associates also represented other manufacturers (selling men's knit shirts and night sport shirts) with Bassett–Walker's knowledge. Robbins knew he was prohibited from selling for any other fleece manufacturer, Robbins depo. at 72–73, but in 1988 his company entered an agreement to sell competing fleecewear with Durham Mills. The sale was to Salem Screen Print Company, a potential Bassett–Walker customer, and Robbins never informed Bassett–Walker of it, and in fact was concerned about the ramifications if Bassett–Walker found out. Robbins depo. at 432–38.

Likewise, Slayton Associates did not sell Bassett–Walker products exclusively; it represented several other manufacturers at the same time, with Bassett–Walker's knowledge. Slayton depo. at 24, 40. In fact, it serviced some of the same accounts for Bassett–Walker and other manufacturers.

### 4. Bassett–Walker's Negotiation with Target

In 1988, Target Stores put its fleecewear business out to bid. Target had been originally part of Slayton Associates' territory and Slayton Associates received a 2% commission on orders. Bassett–Walker made an offer to Target that included a marketing plan, with advertising, volume prices, exclusive brand label, warehouse discounts, an exclusive customer service representative, and direct contact with top-level management at Bassett–Walker. Slayton depo. at 107–09, 178–97. Bassett–Walker officials met directly with Target officials; no one from Slayton Associates was included. *Id.* at 110–12. Bassett–Walker's representative, Sonny Wade, did inform Slayton and Stanley that if negotiations were successful, their commission would be reduced to 2% on the initial $20 million and 1.5% on sales above $20 million. After Target awarded Bassett–Walker its business, Slayton Associates agreed to an even further cut to 1% on the first $30 million and 0.5% thereafter. *Id.* at 172–74. (The commissions were lowered because of additional concessions by Bassett–Walker. *Id.* at 177–78. Slayton concedes that these concessions were based on valid business decisions by Bassett–Walker. *Id.* at 200–03.)

### 5. The Restructuring

In the 1980s, the fleecewear industry was becoming increasingly dominated by a few major retailers who placed increasing demands on suppliers. They wanted to work directly with the manufacturer, and they wanted an independently recognizable brand name. Rowan depo. at 12, 50, 74. Competition increased and Bassett–Walker's market share declined dramatically. Rowan depo. at 87. To remain competitive, Bassett–Walker restructured its approach.

On June 12, 1989, plaintiffs attended a meeting in Martinsville in which each was told that Bassett–Walker was going to reorganize its sales force. It made a strategic business decision to change its marketing of fleecewear. It concentrated on a few major accounts (like Target and Hills) and drastically decreased its private label customers (large retailers who got their own label). It developed a brand name (Lee) and supported it with advertising and customer research. It abandoned entirely the sporting goods market, eliminated small retail customers, and slashed its customer base from approximately 1500 accounts to less that 600. It also elected to handle all sales in house, rely more on computers (Hills particularly wanted

this) to compensate for a shorter lead time in ordering and eliminated all commission-paid sales organizations. Plaintiffs were three of the fourteen independently owned and operated sales organizations notified that their relationship with Bassett–Walker would be terminated. The commissioned sales representatives were allowed to continue selling Bassett–Walker products through December 1, 1989, and Bassett–Walker agreed to pay commissions on all orders shipped by May 31, 1990. Derthick depo. at 365–66; Robbins depo. at 180; Slayton depo. at 90.

To supplement its in-house sales force, Bassett–Walker recruited and hired several individuals formerly associated with the independent sales organizations. After the June 12 meeting, Sonny Wade, Bassett–Walker's National Sales Manager told this to Derthick. Derthick said he would be interested in a position. Wade also asked for and received permission to talk to Sam Impastato. Derthick depo. at 240–42. The following former sales associates were hired: Stan Robbins (age 54), Roy Doyle (age 50), Chuck Goodell (age 48) (of Slayton Associates), Sam Impastato (age 44), Robert Dykstra (age 44), Pete Borges (age 43), Lori Eaton (age 31), Aprille Shaffer (age 31), and Jim Trotter (age 26). In addition Bassett–Walker approached Slayton (age 60) and Stanley (age 60) (both of Slayton Associates). They declined the offer but asked that Slayton's sons, Skip Slayton (age 37) and Tom Slayton (age 32), be offered the jobs, which they accepted. The decision about which individuals to hire was based on customer contacts and geographical location. Butler affid. ¶ 5–7. After Robbins accepted the job, a dispute arose about whether he would work from his home or whether Bassett–Walker would pay for rent of commercial space (Bassett–Walker never agreed to, Robbins depo. at 206), and whether he would relocate from Boston to New York. He declined to relocate and Bassett–Walker declined to pay for office space so Robbins ultimately turned down the job. Robbins depo. at 208–10, 217–18. Robbins' severance letter of February 27, 1990, stated that his status reverted to that of a commissioned sales representative and that he would receive severance pay. Robbins affid. ¶ 117, Ex. K.

Although Derthick, Slayton, and Robbins no longer represent Bassett–Walker, they continue to represent other manufacturers, and service the same accounts they serviced for Bassett–Walker, on behalf of other manufacturers. Derthick depo. at 376–77; Robbins depo. at 429–30; Slayton depo. at 7–8, 302–03. Derthick acknowledges the validity of Bassett–Walker's restructuring and admits it was not done to harm him. *Id.* at 200.

Plaintiffs argue that they took Bassett–Walker from obscurity to dominance in fleecewear. Their territories accounted for ⅓ or $100 million of Bassett–Walker's $300 million in U.S. sales in 1989. Robbins affid. ¶ 11, 65–70, 204, 208. They were not terminated because of lack of sales. Dykstra affid. ¶ 16–17. Plaintiffs blame Bassett–Walker's own limitations for its problems competing in the market. Robbins affid. ¶ 43–47, 63–71, 77, 204–08; Derthick affid. ¶ 31–35, 59–63; Slayton affid. 32–36, 60–66. Indeed, in 1989, plaintiffs' accounts were severely cut back and restricted in the amounts they could order. Robbins affid. ¶ 11, 65–70, 204–08.

They further assert that before VF Corporation's 1984 acquisition of Bassett–Walker, it was run as a family with plaintiffs as members of that family. The custom was that representatives were terminated only for cause. They received assurances that the relationship was long term and in fact were with the company for over 20 years.

At the end of 1984, VF Corporation acquired Bassett–Walker. At that time, it went to great lengths, both orally and in writing, to assure the sales representatives that their relationship with Bassett–Walker would not change. (VF Corporation needed to maintain the level of sales.) Indeed, at the 1988 sales meeting, Tom Butler assured the representatives that they were the best, and the current system did not need to be changed. Robbins affid. ¶ 20–22, 37–41; Derthick affid. ¶ 6–37, 34–138; Slayton affid. ¶ 2–58.

## II. Standard for Summary Judgment

A moving party is entitled to summary judgment "if the pleading, depositions, answers to interrogatories, and admissions on

file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). *See Charbonnages de France v. Smith,* 597 F.2d 406 (4th Cir.1979); *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 67, 68, 130 L.Ed.2d 24 (1994).

In considering the parties' motions for summary judgment, I must view the facts and draw reasonable inferences in a light most favorable to the nonmoving party on a given issue. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986). The party seeking summary judgment bears the initial burden to show an absence of evidence to support the nonmoving party's position. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). The nonmoving party must then demonstrate that a triable issue of fact exists. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. A mere scintilla of evidence supporting the case is insufficient. *Id.*

III. Discussion

A. ADEA Claim

■ Both Derthick and Robbins lodge ADEA claims against defendants arguing that they were discriminated against based on their age. Their ADEA claims must fail because Derthick and Robbins (as well as Slayton Associates) are independent contractors and not employees covered by the statute. *Garrett v. Phillips Mills, Inc.,* 721 F.2d 979 (4th Cir.1983).

The ADEA defines "employee" as "any individual employed by an employer." 29 U.S.C. § 631(f). In interpreting this definition in another statute, the Supreme Court has held that an individual's status would be determined by the common law test of agency. *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 323–24, 112 S.Ct. 1344, 1348–49, 117 L.Ed.2d 581 (1992). The Court would consider the hiring party's means to control the manner and means by which the product is accomplished and, in addition, the following factors:

(1) the skill required;

(2) the source of the instrumentalities and tools;

(3) the location of the work;

(4) the duration of the relationship between the parties;

(5) whether the hiring party has the right to assign additional projects to the hired party;

(6) the extent of the hired party's discretion over when and how long to work;

(7) the method of payment;

(8) the hired party's role in hiring and paying assistants;

(9) whether the work is part of the regular business of the hiring party;

(10) whether the hiring party is in business;

(11) the provision of employee benefits; and

(12) the tax treatment of the hired party.

*Id.* (quoting *Community For Creative Non-Violence v. Reid,* 490 U.S. 730, 751–52, 109 S.Ct. 2166, 2178–79, 104 L.Ed.2d 811 (1989)).

A close examination of the relationship between the parties, from the perspective of the plaintiffs, reveals that Bassett–Walker did not exercise the kind of control required to make the commissioned sales representatives employees. Derthick admits he set his own schedule and was free to schedule vacation without Bassett–Walker's approval (at least until 1988). He did not have to make a maximum or minimum number of sales calls, though he did have to track his appointments on a weekly call report. Bassett–Walker did not control the aspects of his presentation. Likewise, Robbins conducted his own business, and hired and fired his own employees. He even proffered an noncompete agreement to one salesman, Randy Bressler, and when he refused to execute it, fired him.

Examination of the other factors in *Darden* further support this conclusion. Derthick & Associates and Stan Robbins & Associates were incorporated entities which represented other manufacturers' lines, employed other sales representatives, and their own secretaries and bookkeepers (Mrs. Robbins). They rented their own office space, furnished

their own supplies and paid their own daily expenses including stationery and telephone bills. Derthick & Associates had to purchase the Bassett–Walker samples it used in marketing, and Stan Robbins & Associates bore half of the cost of samples not paid for by its customers. For tax purposes, Bassett–Walker treated plaintiffs as independent contractors, reporting the commissions paid on a 1099. Bassett–Walker did not provide any benefits to plaintiffs. They bore the regular sales expenses of servicing accounts. Bassett–Walker only reimbursed them for expenses incurred for sales meetings in Martinsville. Plaintiffs did not have authority to accept orders on behalf of Bassett–Walker, nor did they have discretion to alter the terms of the orders. Plaintiffs themselves emphasize the high degree of skill they brought to the job. See Derthick compl. ¶ 31, 35 ("building up business"; "pioneering work"); Robbins compl. ¶ 110. In *Garrett*, the Fourth Circuit ruled that a sales person was an independent contractor because he chose his own working and vacation hours; paid for his own operating costs; and was not prohibited from selling products for other companies. 721 F.2d at 982. He was also responsible for his own income and social security taxes and did not receive any benefits. *Id.*

Plaintiffs attempt to distinguish *Garrett*, by highlighting the following factors present in the instant case but not in *Garrett*: plaintiffs needed to inform Bassett–Walker of vacation days, needed Bassett–Walker approval to hire sales representatives, and never admitted that they were independent contractors. Defendant correctly points out that these elements of "control" were undertaken for business reasons. Bassett–Walker needed to know their whereabouts, even on vacation, in case it needed to reach them. This "control" over their schedules alone is not sufficient to make them employees. *Carney v. Dexter Shoe Co.*, 701 F.Supp. 1093, 1100

(D.N.J.1988). Plaintiffs did not seek approval to hire and fire clerical staff. They only obtained approval when hiring new sales associates, and that was justified by Bassett–Walker's legitimate business interest in the individuals selling its products. Furthermore, it is clear that Robbins set the terms of the sales representatives' relationship with his company, even terminating several sales associates. That plaintiffs gave no written acknowledgement of their status as independent contractors is not dispositive. *Daughtrey v. Honeywell, Inc.*, 3 F.3d 1488, 1492 (11th Cir.1993).

*ARA Leisure Servs. v. N.L.R.B.*, 782 F.2d 456 (4th Cir.1986), relied on by plaintiffs, is distinguishable. There, the court determined that plaintiffs were employees based on defendant's close control over the individuals' daily lives. Defendant withheld payroll taxes, provided workers' compensation, required vendors to submit employment applications, designated work hours, and enforced workplace rules of conduct. Defendant secured licenses for vendors, procured their space, equipment, uniforms and a certain amount of cash to make change, all in sharp contrast to the present case.

Because I have held that Robbins does not fall within the protection of the statute, I need not consider defendants' further assertion that his claim was not timely, nor need I address defendants' assertion that Bassett–Walker's restructuring did not constitute age discrimination.

## B. Breach of Contract

Defendants assert that Virginia law should govern the relationship between the parties, the breach of contract and other state law claims, because the initial contract between plaintiffs and defendant was made in Martinsville, all significant terms were set then, and the relationship was terminated in Virginia.[2] Performance centered in Virginia.

2. *Van Dusen v. Barrack*, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964), mandates that the Court apply the transferor court's choice of law in a § 1404(a) forum non conveniens transfer. New York law controls because that court was sitting in diversity. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 498, 61 S.Ct. 1020, 1022,

85 L.Ed. 1477 (1941). Under New York law, the "center of gravity" or "grouping of contacts" test directs you to consider the most significant contacts in this dispute. *In re Allstate Ins. Co.*, 81 N.Y.2d 219, 597 N.Y.S.2d 904, 613 N.E.2d 936 (1993). These contacts include the place of contracting, negotiation and performance, the loca-

Plaintiffs were in multiple states, but Bassett–Walker always performed its obligations in Virginia, including accepting orders, filling orders, and sending out commissions. Plaintiffs had regular contacts with Virginia, calling Bassett–Walker's offices and attending sales meetings. In their responsive brief, plaintiffs continue to advance their state law claims, but also assert a claim under Virginia's conspiracy statute and do not rebut defendant's arguments that Virginia law should govern. Because they tacitly concede that Virginia law is appropriate, I will apply Virginia law.

■ The contract at issue here consisted of an oral agreement between the plaintiffs and Bassett–Walker to solicit orders for Bassett–Walker in certain geographic areas in exchange for a certain percentage of the sales as a commission. Plaintiffs claim that Bassett–Walker's unilateral decision to terminate them in June 1989 breached that contract.

■ In Virginia, a contract for services is terminable at will if the intended duration of the contract cannot be reasonably inferred from its terms. *Miller v. SEVAMP, Inc.*, 234 Va. 462, 362 S.E.2d 915, 918 (1987). If one party is free to terminate the relationship at will, then so is the other party. *Id.* 362 S.E.2d at 917. The burden is on the party claiming a definite duration to rebut this presumption. *Progress Printing Co. v. Nichols*, 244 Va. 337, 421 S.E.2d 428, 429 (1992).

■ Derthick, Robbins, and Slayton all claim that they could terminate the relationship at any time for any reason, but that Bassett–Walker could only terminate it for cause. This alone creates employment at will according to *Miller*. Plaintiffs attempt to rebut the at-will presumption by highlighting Bassett–Walker's alleged custom, but can cite only one instance in support of a "for cause" termination—a comment by a Bassett–Walker executive that the only time Bassett–Walker ever terminated an employee was for good cause. Derthick depo. at 87–88; Robbins depo. at 326–31. This is insufficient under *Title Ins. Co. v. Howell*,

158 Va. 713, 164 S.E. 387, 389 (1932) ("one swallow does not make a summer"). Robbins also referred to a comment by Tom Butler that he (Robbins) "[didn't] have to worry." No plaintiff could identify any agreed upon provisions regarding termination, such as lifetime tenure, citing only the 1984 and 1988 statements that no changes would be made in the sales force. Derthick depo. at 91–93; Robbins depo. at 326–31; Slayton depo. at 146–49. Under Virginia law, vague comments cannot rebut the presumption that the contracts were terminable at will. *See Addison v. Amalgamated Clothing & Textile Workers Union*, 236 Va. 233, 372 S.E.2d 403, 405 (1988) (employment was terminable at will even though employer gave assurances that employee had the job as long as he wanted it); *Miller*, 362 S.E.2d at 916; *Ohanian v. Avis Rent A Car Sys., Inc.*, 779 F.2d 101, 109 (2d Cir.1985) (distinguishing between casual comments or mere pep talks delivered by management to a group of employees, which could not create a presumption that a contract was for a definite period, and one-on-one negotiations with a star employee). Nor did Slayton Associates' Strategic Business Plan modify the contract to create a term lasting the duration of the plan (until 1992). That plan was unilaterally produced by Slayton Associates; it was not requested or endorsed by Bassett–Walker. It did not contain language that the relationship would last until 1992. Second, custom is used to clarify terms not to add terms to a contract. *See Chas. H. Tompkins Co. v. Lumbermens Mut. Cas. Co.*, 732 F.Supp. 1368, 1375–76 (E.D.Va.1990). Finally, parties to an agency contract, such as plaintiffs (as independent contractors), are usually businesses who could have contracted for such a "just cause" term. *See Plaskitt v. Black Diamond Trailer Co.*, 209 Va. 460, 164 S.E.2d 645 (1968).

Plaintiffs' reliance on *Barger v. General Electric Co.*, 599 F.Supp. 1154, 1161 (W.D.Va. 1984), is misplaced. It dealt with employee handbooks, was based on an employment relationship, and a writing (the handbook) existed. Here, there is no writing, only non-specific, vague and ambiguous statements

tion of the subject matter of the contract, and the domicile of the contracting parties.

made in a variety of contexts over the course of 20 years.

This case is similar to *Plaskitt v. Black Diamond Trailer Co.*, 209 Va. 460, 164 S.E.2d 645 (1968). In *Plaskitt,* plaintiffs were exclusive sales representatives selling defendant's trailers in the Virginia area in exchange for a 2% commission. Two years after they had entered into the agreement, defendant notified plaintiffs that they were terminated, giving them 3 months notice. The court found that the parties had entered into a contract for an indefinite and indeterminable period and therefore the contract was terminable at will by either party. There as here the plaintiffs attempted to rebut the at-will presumption by pointing to additional consideration—the salesmen paid additional expenses. The court found those expenses incidental to their performing the personal service of selling, which they had contracted to provide. *Id.* 164 S.E.2d at 648–49.

Plaintiffs' argument that they provided additional consideration sufficient to support imposition of a just cause termination provision must similarly fail under the reasoning in *Plaskitt* (distinguishing between a personal services contract and a franchise or distributorship). They fail to introduce any evidence that Bassett–Walker requested plaintiffs to forego specific job opportunities to represent other manufacturers. To the contrary, they represented other manufacturers with Bassett–Walker's knowledge. There is no evidence that they turned down other manufacturers. What additional consideration they supplied was in the form of incidental expenses—incurred during the ordinary course of selling Bassett–Walker's and other manufacturers' products. *See Plaskitt,* 164 S.E.2d at 648. Of course, if I found such additional consideration, that would only impose a duty on defendants to give reasonable notice before termination to allow plaintiffs to recoup their investment. *Jack's Cookie Co. v. Brooks,* 227 F.2d 935, 938–39 (4th Cir.1955), *cert. denied,* 351 U.S. 908, 76 S.Ct. 697, 100 L.Ed. 1443 (1956); *Plaskitt,* 164

S.E.2d at 649–50. It is undisputed that Bassett–Walker gave 6 months notice and paid commissions on shipments made through May 1990.

▮▮▮ Even if plaintiffs could establish that the contract was of a definite duration, it would violate Virginia's statute of frauds.[3] Under *Graham v. Central Fidelity Bank,* 245 Va. 395, 428 S.E.2d 916, 917 (1993), the statute of frauds applies to an employment contract terminable for cause. In *Windsor v. Aegis Serv., Ltd.,* 691 F.Supp. 956, 958 (E.D.Va.1988), *aff'd,* 869 F.2d 796 (4th Cir. 1989), the court held that an oral contract terminable for just cause was unenforceable under the statute of frauds, and distinguished *Frazier v. Colonial Williamsburg Foundation,* 574 F.Supp. 318, 320 (E.D.Va. 1983), upon which plaintiff relies. Likewise, in *Falls v. Virginia State Bar,* 240 Va. 416, 397 S.E.2d 671, 672–73 (1990), the Virginia Supreme Court would not enforce such an oral contract unless a written memorandum included the essential terms, and specifically that the contract was terminable for cause, and was signed by the party against which enforcement is sought. Derthick can only point to commission statements, sales catalogues and price lists. Robbins identified catalogues and order forms. Slayton referred to his relationship as the "handshake contract" and identified only letters between himself and Montgomery. Slayton depo. ex. 1–4. These are insufficient to satisfy the statute of frauds because they fail to state that the contract was terminable only for cause. Plaintiffs rely on earlier cases which were modified by these cases.

▮▮▮ Because the contractual relationship was terminable at will, Robbins' wrongful termination claim must also fail. Under Virginia law, to maintain a suit for wrongful termination of employment at will, the termination must be against public policy, which includes personal freedoms. *Lockhart v. Commonwealth Educe. Sys. Corp.,* 247 Va. 98, 439 S.E.2d 328, 331 (1994). Courts have found such an exception only where the termination otherwise violated rights recognized

---

**3.** This is a procedural statute applied in diversity cases, *Stein v. Pulaski Furniture Corp.,* 217

F.Supp. 587 (W.D.Va.1963)).

by the legislature and embodied in state statutes. *Bowman v. State Bank of Keysville*, 229 Va. 534, 331 S.E.2d 797, 801 (1985), but not private rights or interests. *Miller*, 362 S.E.2d at 918. Plaintiffs have not identified any public interests, only private ones (business interest and good will). Second, plaintiffs are independent contractors, not employees; thus, the courts' narrow exception to the employment at will doctrine is not available in any event.

■ Robbins also argues that Bassett–Walker violated a covenant of good faith and fair dealing, but Virginia does not recognize an independent claim for breach of this implied covenant. *L & E Corp. v. Days Inns of Am., Inc.*, 992 F.2d 55, 59 (4th Cir.1993); *Sneed v. American Bank Stationary Co.*, 764 F.Supp. 65, 67 (W.D.Va.1991). Even under Massachusetts law, which does recognize such a claim, Robbins' claim must fail. The courts have recognized that the implied covenant is not breached if a legitimate business reason exists for the termination, recognizing that an employer needs wide latitude and flexibility in a changing business world. *Fortune v. National Cash Register Co.*, 373 Mass. 96, 364 N.E.2d 1251, 1256 (1977). Plaintiffs have failed to rebut Bassett–Walker's business justifications, suggesting only that in retrospect the restructuring was a poor business decision. The courts have failed to find a breach of the covenant of good faith and fair dealing when the claim has been based on loss of commissions on sales that have not yet been made (i.e., commissions not yet earned), *King v. Mannesmann Tally Corp.*, 847 F.2d 907, 908 (1st Cir.1988), nor is the discharge of an at-will employee without cause alone a violation of this covenant. *Gram v. Liberty Mutual Ins. Co.*, 384 Mass. 659, 429 N.E.2d 21, 28 (1981).

■ As a matter of law, the contract between the parties was terminable at will by either side, Bassett–Walker's 1989 termination cannot form the basis for a breach of contract claim.[4]

## C. Tortious Interference with Contract

■ All three complaints allege interference with customer accounts, arguing: (1) Bassett–Walker began to deal directly with certain accounts; (2) Bassett–Walker allocated their goods to other accounts on a preferential basis; and (3) Bassett–Walker terminated their relationship with the accounts (Derthick and Robbins only). The Supreme Court set out the elements of this tort in *Chaves v. Johnson*, 230 Va. 112, 335 S.E.2d 97 (1985): (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the intervenor; (3) intentional interference inducing or causing a breach or termination in the relationship or expectancy; and (4) resultant damage. Justification or privilege is an affirmative defense. Specific grounds for the defense include: legitimate business competition, financial interest, directing business policy, and giving requested advice. 335 S.E.2d at 103.

## 1. Interference with Accounts

■ Essentially, plaintiffs are accusing Bassett–Walker of interfering with its own accounts, which cannot support their claims. The core contractual relationships are the sales contracts plaintiffs solicited for Bassett–Walker. The resulting contracts were between Bassett–Walker and its customer; plaintiffs were not parties thereto. The Fourth Circuit set a high standard for making out a claim of tortious interference against a financially interested party in *Zoby v. American Fidelity Co.*, 242 F.2d 76, 79–80 (4th Cir.1957) (contractor claimed surety, who had taken responsibility for bidding out Navy contract, interfered when it refused his bid). Where a party is financially interested and such interest motivates his conduct, then he is not an intermeddler. In *Zoby*, because defendant was a party to the transaction, it was acting in its own interest and not seeking to gain unfair advantage over a third party. *Id.* at 80. This Court, in *Johnson v.*

---

4. Note, if Illinois law applies to Slayton Associates' breach of contract claim, defendants should still prevail because plaintiff can show no more than a contract terminable at will. Plaintiff admits that the contract was terminable for inade- quate performance. Slayton compl. ¶ 21. Under Illinois law, a contract terminable for poor performance is an at-will contract. *Gordon v. Matthew Bender & Co.*, 562 F.Supp. 1286 (N.D.Ill.1983); other cases.

*McKee Baking Co.,* 398 F.Supp. 201 (W.D.Va.1975), *aff'd,* 532 F.2d 750 (4th Cir. 1976), rejected such claims as falling within the scope of the economic interest privilege recognized by *Zoby.* (Plaintiffs accused defendants of dealing directly with accounts and also trying to learn the identity of plaintiffs' customers and gain proprietary information.)

In *Frishberg v. Esprit de Corp.,* 778 F.Supp. 793, 803–04 (S.D.N.Y.1991), *aff'd,* 969 F.2d 1042 (2d Cir.1992), the court granted summary judgment dismissing a similar claim because it found that business relationships were not independent of Esprit, the relationship between plaintiffs and Esprit was at will, and plaintiffs had no independent right to sell Esprit merchandise.[5] Likewise, in *McEntee v. Van Cleef & Arpels, Inc.,* 166 A.D.2d 359, 561 N.Y.S.2d 25, 26 (1st Dep't 1990), the court found that customers belonged to the company, and the former salesman had no independent interest in those customers upon which he could base an action for tortious interference. Indeed, Bassett–Walker always retained the right to choose when and to whom to ship its products, how much to ship, and whether to accept or reject orders.

Furthermore, even Derthick admits that Bassett–Walker's restructuring was legitimate. Butler's affidavit and Rowan's deposition testimony regarding Bassett–Walker's strategic business decision to restructure to adjust to the changing fleece market are unrebutted. Dykstra's affidavit, filed in support of plaintiff's case, does not create a triable issue. Based on his one year as a salaried sales employee, he alleges that the restructuring did not improve the servicing of accounts. Even if true, Dykstra offers no evidence to dispute that Bassett–Walker made the changes for legitimate reasons even if the changes were unsuccessful.

■ Moreover, the incidental effects, e.g., loss of commissions, flowing from a legitimate business decision, cannot constitute intentional interference. *Nationwide Mut. Fire Ins. Co. v. Jones,* 577 F.Supp. 968 (W.D.Va.1984); *see also Mitchell Mach., Inc.*

*v. Ford New Holland, Inc.,* 918 F.2d 1366, 1371 (8th Cir.1990); *Robert J. McRell Assocs. v. Insurance Co. of N. Am.,* 677 F.Supp. 721, 729–30 (S.D.N.Y.1987).

Finally, Bassett–Walker's acts did not actually terminate any of plaintiffs' relationships with the accounts. Its actions merely prevented plaintiffs from selling its merchandise. Derthick, Robbins and Slayton all admit that they continued to sell other manufacturers' merchandise to these same accounts. Derthick depo. at 376–77; Robbins depo. at 429–30; Slayton depo. at 303–04.

### 2. Preferential Allocations

■ Plaintiffs also claim that Bassett–Walker interfered with their accounts by allocating merchandise to specific accounts on a preferential basis. Derthick and Slayton point specifically to the preferential treatment Target Stores got that other accounts did not. Derthick depo. at 234–38; Slayton depo. at 325–27. (Robbins admits that two of his accounts also got preferential treatment (Hills and T–Shirt Station). Robbins depo. at 356–62). The *Frishberg* court rejected such a claim because the business relationships with which Esprit interfered belonged to it not plaintiff. 778 F.Supp. at 804. Likewise, Bassett–Walker was only interfering with business relations that belonged to it.

### 3. Interference with Sales People

■ Derthick & Associates claims that Bassett–Walker interfered with its salespeople, based on Bassett–Walker's hiring of Dykstra and Impastato, but their relationships with Derthick & Associates were at will and terminable at any time for any reason. Derthick depo. at 152–55. Thus, when they accepted employment with Bassett–Walker, they did not breach any contract with Derthick & Associates. Derthick depo. at 239.

Because the relationship between the salespeople and Derthick & Associates was terminable at will, plaintiffs must also show that Bassett–Walker used improper means (violation of law, violence, threats, fraud, misrepresentation, deceit, duress, etc.). *Peace v. Con-*

---

**5.** Plaintiffs rely on *Bergstein v. Jordache,* 767 F.Supp. 535, 543–44 (S.D.N.Y.1991), but that case predated *Frishberg* and was decided on a motion to dismiss.

*way,* 246 Va. 278, 435 S.E.2d 133, 135 (1993). In the instant case, Bassett–Walker informed Derthick that it planned to expand its in-house sales force and also talk to his associates. Derthick gave Bassett–Walker permission to talk to Impastato, and asked to be considered for a position. Derthick depo. at 239–42. Absent improper means, Bassett–Walker's hiring away of two associates did not constitute improper interference. *See Hechler Chevrolet, Inc. v. General Motors Corp.,* 230 Va. 396, 337 S.E.2d 744, 748 (1985).

### D. Conversion

The tort of conversion is defined in *Universal C.I.T. Credit Corp. v. Kaplan,* 198 Va. 67, 92 S.E.2d 359, 365 (1956), as the wrongful exercise of authority or act of dominion over another's goods depriving him of their possession or the right to their possession. Courts have dismissed conversion claims based on future commissions on several grounds. In *Unlimited Screw Prods., Inc. v. Malm,* 781 F.Supp. 1121, 1131 (E.D.Va.1991), the court held that the future contracts could not legally support the claim and denied a terminated salesman's claim. Other courts have found that a sales representative whose relationship is at-will does not have any cognizable interest in commissions after the relationship has been terminated. *Wood v. Hutchinson Coal Co.,* 176 F.2d 682 (4th Cir. 1949); *see also Frishberg,* 778 F.Supp. at 793.

In *Wood v. Hutchinson,* the Fourth Circuit denied plaintiff's claim that he was entitled to continued commissions from a customer he obtained for defendant. As a sales agent for defendant, he had obtained an account and earned commissions off that initial sale, but before he could renew the sales contract, defendant independently renewed the contract and terminated its relationship with plaintiff. The Fourth Circuit affirmed the lower court's grant of summary judgment, holding that the fact that plaintiff had negotiated the initial contract does not give him a right to commissions on a renewal he does not secure, in the absence of a contract to that effect. 176 F.2d at 684.

In *Mackie v. LaSalle Indus., Inc.,* 92 A.D.2d 821, 460 N.Y.S.2d 313 (1st Dep't 1983), the court granted summary judgment on a salesperson's claim of conversion of future commissions on an account she had personally acquired. She had acquired a lucrative account and after some time, defendant took her account away (allegedly because the account was dissatisfied) and terminated her. The court defined her relationship as at-will and held that she was not entitled to commissions after the termination of her relationship with the defendant. 460 N.Y.S.2d at 315.

### E. Robbins' Massachussets Law Claims (Unfair Trade Practices)

 Plaintiffs claim Bassett–Walker violated Chapter 93A of the General Laws of Massachusetts. First, Virginia law applies precluding a claim under Massachusetts law. *See Worldwide Commodities v. J. Amicone Co.,* 36 Mass.App.Ct. 304, 630 N.E.2d 615 (1994) (barring claim under same law because New York law governed). Second, even if Massachusetts law applies, plaintiffs' claim fails because the core breach of contract claims did not occur "primarily and substantially" within Massachusetts, as required under Mass.Ann.Laws ch. 93A § 11. Not only did most of Bassett–Walker's allegedly bad acts occur in Virginia, including the 1989 termination meeting, but also Robbins' territory included other states.

### F. Slayton Associates' Illinois Law Claims

 Slayton Associates claims that defendants violated the Illinois Sales Representative Act, 820 ILCS 120/2, which requires timely payment of commissions due on or after termination. Plaintiff has merely recast its breach of contract claim. In *Hammond Group v. Spalding & Evenflo Cos.,* 1993 WL 87708, at *6, 1993 U.S.Dist. LEXIS 3756, at *17–18 (N.D.Ill.1993), the court granted summary judgment on claims under this law because plaintiff was seeking future commissions and admitted it received all commissions rightfully due it before it was terminated, and plaintiff could not show it was entitled to commissions after it was terminated. Likewise here, plaintiff was paid

all commissions to which it was entitled, including commissions for sales to Target Stores. Plaintiff had specifically agreed to the reduced commissions. There was no agreement that plaintiff would received commissions on Target sales indefinitely. Plaintiff is not entitled to commissions on sales it did not make (it is claiming commissions for sales by Bassett–Walker's salaried salespeople in plaintiff's old territory). There was no agreement for continuing commissions for an indefinite period. There was only an agreement regarding orders shipped before May 31, 1990. There also was no such custom or practice at Bassett–Walker to pay continuing commissions to former sales representatives, nor could Slayton identify any former representatives receiving continued commissions. Slayton depo. at 304–05. Plaintiff's Strategic Plan cannot support a claim to commissions through 1992 because it was produced unilaterally and was not endorsed by Bassett–Walker.

■ Slayton Associates cites Bassett–Walker's production and distribution problems, and its direct sale to accounts, bypassing commissioned sales representatives, as unfair trade practices, in violation of the Illinois Deceptive Trade Practices Act, 815 ILCS § 510/1. That act targets two deceptive practices: misleading trade identification and deceptive advertising. *See Barliant v. Follett Corp.*, 138 Ill.App.3d 756, 91 Ill.Dec. 677, 682, 483 N.E.2d 1312, 1317 (1st Dist. 1985) (holding no violation of the act because there was no breach of contract). Plaintiff makes no allegation that Bassett–Walker mislabeled or misadvertised its products to deceive or confuse the public. Plaintiff only alleges that plaintiff was deceived. Plaintiff claims injury to the public because of reduced competition but has no evidence for this and this does not state a claim under the above statute.

■ Plaintiff's claim under the Illinois Consumer Fraud and Deceptive Business Practices Act (CFDBPA) also fails. This statute prohibits unfair or deceptive methods of competition in conducting any trade or business. 815 ILCS § 505/2. In *Quality Alliance v. Atmosphere Processing*, 1994 U.S.Dist. LEXIS 142, at *3–5 (N.D.Ill.1994),

the court rejected a claim by a sales associate claiming a manufacturer made misrepresentations and then terminated the representative. The court held that the manufacturer was the purchaser of the representative's services. Likewise, here Bassett–Walker was the consumer.

### G. Unjust Enrichment

■ Plaintiffs essentially argue that Bassett–Walker fleeced the commissioned sales representatives and was unjustly enriched, under *Nossen v. Hoy*, 750 F.Supp. 740 (E.D.Va.1990). As I understand plaintiffs' position, they are not claiming that no contract existed but that, based on their relationship with Bassett–Walker and their years of service, they should be entitled to commissions beyond the terms of their contract as I have defined it above. The equitable doctrine of unjust enrichment—implying a contract where none existed—is neither necessary nor appropriate, however, because a contract exists between the parties and plaintiffs do not dispute that they received the compensation due them under that contract.

### H. Conspiracy Under Virginia Law

■ As mentioned above, defendants acknowledge (and in fact urge) that Virginia law applies. Plaintiffs in their brief, therefore, incorporate a claim for violation of the Virginia conspiracy statute, Va.Code § 18.2–499(a). Even assuming that the claims are timely, the conspiracy between Bassett–Walker and its parent, VF Corporation, must fail under the intracorporate conspiracy doctrine. *Fox v. Deese*, 234 Va. 412, 362 S.E.2d 699 (1987). The Southern District of New York previously held that the two defendants operated essentially as the same entity, *see* Mem.Op. of Judge Cannella, Sept. 23, 1992, a position plaintiffs urge in arguing that VF Corporation should be held liable. *See* Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, at 61–65. Defendants' alleged conspiracy with Target Stores is not viable because I have already found, and plaintiffs have not rebutted, that Bassett–Walker acted for legitimate business reasons. Plaintiffs cannot, therefore, show a willful and malicious pur-

pose behind Bassett–Walker's deal with Target, as required under the statute.

As to all of the claims, plaintiffs cannot surmount the legal and factual threshold necessary to survive summary judgment. Their affidavits are little more than legal conclusions and do not create disputed issues of fact.

An appropriate order shall issue.

### ORDER

For the reasons expressed in the accompanying memorandum opinion, it is hereby **ADJUDGED** and **ORDERED** that defendants' motions for summary judgment in all three cases are **GRANTED.**

The clerk is directed to send a certified copy of this order and accompanying memorandum opinion to all counsel of record and to strike this case from the docket.