**Stephanie J. KING, Plaintiff,**

v.

**John H. DALTON, Secretary of the Navy, et al., Defendants.**

**Civ. A. No. 95–250–A.**

United States District Court, E.D. Virginia, Alexandria Division.

July 28, 1995.

Paul J. Kennedy, Kip Schwartz, Susan B. Gerson, Graham & James, Washington, DC, for plaintiff.

Helen F. Fahey, United States Attorney, Jeri Kaylene Somers, Assistant United States Attorney, Meredith Manning, Special Assistant United States Attorney, Alexandria, VA, Kevin J. Keefe, Associate Counsel, Office of the General Counsel, Department of the Navy, Arlington, VA, for John H. Dalton, Sec. of the Navy.

Frank G. Aschmann, Aschmann and Aschmann, Alexandria, VA, for John C. Lovett.

### MEMORANDUM OPINION

ELLIS, District Judge.

In this Title VII[1] sexual harassment suit brought against the Navy[2] and one of its employees, the question presented is whether, and under what circumstances, an employee of a government contractor is also deemed to be an employee of the government for Title VII purposes. The threshold, general question is whether an employee may have more than one employer under 42 U.S.C. § 2000e–16, the provision governing the federal government's Title VII liability. If so, then the specific question presented here is whether the facts at bar warrant a conclusion that both the Navy and the government contractor were plaintiff's employers for purposes of Title VII liability.

For the reasons that follow, the Court concludes first that an aggrieved employee, in appropriate circumstances, can have more than one employer under § 2000e–16. Next, the Court further concludes that those circumstances did not exist in the instant case.

### I.[3]

Plaintiff Stephanie King was hired by Booz–Allen & Hamilton, Inc. ("Booz–Allen") in June 1990. At the time, Booz–Allen was performing under a contract with one of its large clients, the Department of the Navy's Space and Naval Warfare System Command ("SPAWAR"). Under one portion of the contract, Booz–Allen was to help coordinate the installation of satellite communication systems aboard U.S. Navy ships, submarines, and shore batteries. While the Navy contemplated that it would perform the actual installation of the equipment, it hired Booz–Allen to provide certain support services and to devise an implementation plan for the communication systems' installation. In August 1990, two months after her arrival, Booz–Allen assigned King to work on this portion of the SPAWAR contract ("the project"). Among others, her responsibilities included scheduling the communication systems' installation and preparing the project budget. Dan Coole, another Booz–Allen em-

---

1. Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq.

2. The named defendant is John H. Dalton, and he is sued in his official capacity as Secretary of the Navy. For convenience and clarity, this defendant is referred to as "the Navy".

3. In light of the procedural posture of this case, the facts are presented here in the light most favorable to Plaintiff. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

ployee, was King's immediate supervisor and generally managed Booz–Allen's performance of the project.

Booz–Allen's performance of the SPAWAR contract necessarily involved close and frequent dealings between Navy and Booz–Allen personnel. In particular, Defendant John Lovett was the Navy employee in charge of planning and executing the project. It was his responsibility to insure that the communication systems were properly installed. In this capacity, he met several times a week with Booz–Allen personnel, including King, at Booz–Allen's offices to discuss the project and monitor its progress.

King worked exclusively on the SPAWAR project from August 1990 until June 1993. During this period, she contends, Lovett subjected her to repeated and unwelcome sexual advances. More specifically, she alleges that Lovett frequently made sexually explicit and demeaning remarks to her, touched her inappropriately or positioned himself in close proximity to her, commented on her physical appearance, and leered at her. In addition, he suggested that she accompany him on certain business trips, which, he indicated, were at least partly for pleasure. King reported Lovett's behavior to Booz–Allen and Navy management, both of which ultimately investigated her complaint. Following her complaint, Robert McGlothlin, the Navy's Director of SPAWAR, directed Lovett to write King a letter of apology and to attend sexual harassment prevention training. Despite these reprimands, Lovett's behavior continued. According to King, when she again made it clear that she was uncomfortable working directly with Lovett and would not tolerate his demeaning behavior, she was removed from the project and demoted to a less desirable and less responsible position. Dissatisfied, King then resigned from Booz–Allen.

On March 4, 1994, King filed suit against Booz–Allen for sexual harassment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and for intentional infliction of emotional distress under state common law. In her complaint, she alleged that Booz–Allen was her employer, that the company did not take adequate steps to remedy the situation with Lovett (whom she referred to as the "client"), and that it retaliated against her for her complaints of sexual harassment. Booz–Allen and King ultimately settled that dispute, the terms of which are neither publicly available nor material to the instant dispute.

Following her settlement with Booz–Allen, King brought this suit against the Secretary of the Navy, John Dalton, in his official capacity ("the Navy") and against Lovett in both his individual and official capacities. This complaint charges one count of Title VII sexual harassment against both defendants. In response, the Navy filed a motion to dismiss on the ground that the Navy was not King's employer during the period in question, and therefore is not a proper defendant under the relevant Title VII provisions.[4] Similarly, Lovett moves to dismiss on the ground that he is not an employer and therefore not subject to suit under Title VII. King opposes the motions, claiming that Defendants possessed sufficient control over the means and manner of her work to render them "employers" for purposes of Title VII liability. Resolution of these opposing contentions constitutes the task at hand.

■ Because the parties have referred to matters outside the pleadings in connection with the motions to dismiss, including declarations and transcripts of deposition testimony,[5] the motions will be treated as ones for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. *See* Fed. R.Civ.P. 12(b). *See also Hagel v. United Land Co.,* 759 F.Supp. 1199, 1201 n. 7

---

4. Initially, the Navy and Lovett also moved to dismiss on the independent ground that King had not exhausted her administrative remedies. Defendants have apparently abandoned this argument in view of King's statements that she repeatedly attempted to file an administrative claim, but was turned away because she was not a Navy employee.

5. At the time that these motions to dismiss were filed, discovery in this action had not yet commenced. The deposition transcripts that were submitted by King in opposition to the motions had been prepared in connection with her previous suit against Booz–Allen.

(E.D.Va.1991); *Hawkins v. Murray,* 798 F.Supp. 330, 332 n. 3 (E.D.Va.1992).

## II.

█ Title VII of the Civil Rights Act of 1964 prohibits employment discrimination based on race, color, religion, sex, or national origin. 42 U.S.C. § 2000e, *et seq.*[6] As originally enacted, however, Title VII did not extend to discrimination in the federal workplace. *See* § 2000e(b) (excluding federal government from definition of "employer"). To remedy this, Congress amended Title VII in 1972 by explicitly waiving the United States' sovereign immunity with respect to employment discrimination. Equal Employment Opportunity Act of 1972, § 11, 42 U.S.C. § 2000e–16. Yet, rather than simply adding the United States to the universe of possible "employers" that may be sued under § 2000e–2, Congress created a separate and distinct provision to govern federal workplace discrimination. § 2000e–16. Significantly, the Supreme Court has held that § 2000e–16 "provides the exclusive judicial remedy for claims of discrimination in federal employment." *Brown v. General Servs. Admin.,* 425 U.S. 820, 835, 96 S.Ct. 1961, 1969, 48 L.Ed.2d 402 (1976). Therefore, the Navy's liability, if any, must be found in accordance with the strictures of § 2000e–16.

█ Section 2000e–16, entitled "Employment by Federal Government," provides, in pertinent part:

All personnel actions affecting employees or applicants for employment ... in military departments ... shall be made free from any discrimination based on race, color, religion, sex, or national origin.

§ 2000e–16(a). As the explicit terms of this provision make clear, a threshold requirement for imposing Title VII liability against the federal government is that the plaintiff be an "employee[ ] or applicant[ ] for employment" of the defendant federal agency, in this instance, the United States Navy.[7]

As King readily concedes, Booz–Allen was plainly her employer during the time of the alleged harassment. Booz–Allen interviewed King; hired her for an indefinite time period; assigned her to the SPAWAR project; supervised her work; gave her regular performance appraisals; provided her workplace, equipment and supplies; maintained sole authority for hiring, training, and firing her; paid her salary; withheld income taxes; paid her Social Security; and provided her with annual leave, raises, bonuses, and health insurance. In short, Booz–Allen's connection with King displays all the indicia of a traditional, common law employment relationship. Indeed, as noted, King has already brought suit against Booz–Allen based on the same underlying allegations of harassment.

█ Citing the previous litigation between King and Booz–Allen, the Navy urges as a preliminary matter that King is judicially estopped from claiming that the Navy was her employer. The doctrine of judicial estoppel precludes a party from "playing fast and loose" with the judicial system by taking inconsistent positions in successive judicial proceedings in accordance with that party's fluctuating self-interest. *Guinness PLC v. Ward,* 955 F.2d 875, 899 (4th Cir.1992).

---

**6.** It is well settled that this prohibition includes "quid pro quo" sexual harassment, as well as harassing conduct that creates a "hostile environment" for the injured employee. *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

**7.** In her initial pleading opposing the Navy's motion to dismiss, King argued as a preliminary matter that Title VII does not require a plaintiff to be an employee of the defendant employer. In support of this argument, King cited the language of § 2000e–2 (rendering it "an unlawful employment practice for an employer ... to discriminate against *any individual* with respect to his compensation, terms, conditions, or privileges of employment") (emphasis added) and cases decided thereunder. *See, e.g., King v.*

*Chrysler Corp.,* 812 F.Supp. 151, 153 (E.D.Mo. 1993) (rejecting need for employee-employer relationship between plaintiff and defendant under § 2000e–2); *Pardazi v. Cullman Medical Ctr.,* 838 F.2d 1155, 1156 (11th Cir.1988) (defendant's interference with plaintiff's employment relationship with third party suffices under § 2000e–2). But, as King now apparently concedes, § 2000e–2 is inapplicable to cases against the federal government, and the plain terms of § 2000e–16, which govern here, require a plaintiff to be an employee of the defendant agency. *See, e.g., Spirides v. Reinhardt,* 613 F.2d 826, 829 (D.C.Cir. 1979) (holding that § 2000e–16 "cover[s] only those individuals in a direct employment relationship with a government employer").

Thus, the Navy contends, King should be estopped from claiming that the Navy was her employer during her work on the SPA-WAR contract, when she previously claimed in her suit against Booz–Allen that *Booz–Allen* was her employer during this same time period. But the Navy's judicial estoppel argument misses the mark, for it incorrectly assumes that King may have only one employer for Title VII purposes. King does not dispute that she was an employee of Booz–Allen during the period of alleged harassment. Instead, she contends that *both* Booz–Allen and the Navy were her *de facto* employers for purposes of satisfying Title VII's broad remedial goals.

The threshold question, therefore, is whether § 2000e–16 can be read to permit multiple "employers" for one aggrieved "employee". And this question, it appears, has not yet been addressed in the decisional law. Nonetheless, several courts, including this one, have considered this question in the private employment context under § 2000e–2 and concluded that a plaintiff may, in certain circumstances, have more than one "employer" for purposes of Title VII liability. *See, e.g., Magnuson v. Peak Technical Servs., Inc.,* 808 F.Supp. 500, 507–08 (E.D.Va.1992) (stating that "[a]n individual may be the employee of more than one 'employer' for purposes of Title VII"); *Amarnare v. Merrill Lynch, Pierce, Fenner & Smith,* 611 F.Supp. 344, 347–49 (S.D.N.Y.1984) (temporary employee was employee of both temporary agency and brokerage firm to which she was temporarily assigned); *Alie v. Nynex Corp.,* 158 F.R.D. 239, 245 (E.D.N.Y.1994) (stating that "[t]he law is clear that an individual may be the employee of more than one 'employer' for Title VII purposes"). *Cf. Virgo v. Riviera Beach Assocs., Ltd.,* 30 F.3d 1350 (11th Cir.1994) (interpreting term "employer" under Title VII to include "joint employers").

■ Nothing in the text of § 2000e–16 or its legislative history suggests that a different result should obtain when the federal government is one of the putative "employers", nor has the Navy pointed to any case law to the contrary. While § 2000e–16 indisputably requires an employment relationship between the government and the aggrieved individual, it is consistent with the underlying remedial purpose of Title VII to accord a liberal interpretation of its requirements. *See Magnuson,* 808 F.Supp. at 508 & n. 3. Moreover, in enacting § 2000e–16, "Congress clearly intended to give public employees the same substantive rights and remedies that had previously been provided for employees in the private sector." *Douglas v. Hampton,* 512 F.2d 976, 981 (D.C.Cir.1975) (citations omitted). Thus, where the text permits, and it does so here, § 2000e–2 and § 2000e–16 should be read in harmony.[8] Given this, Booz–Allen's undisputed status as King's employer does not automatically preclude a finding that the Navy shared that status during the time period in question. Accordingly, the question then is whether the Navy's relationship with King warrants the conclusion that, for Title VII purposes, King was employed by the Navy as well as by Booz–Allen.

■ As noted earlier, § 2000e–16 requires the plaintiff to be an "employee[ ] or applicant[ ] for employment" with the federal government. As a result, independent contractors and others who lack an employment relationship with the federal government are not covered by § 2000e–16. *See, e.g., Spirides v. Reinhardt,* 613 F.2d 826, 829 (D.C.Cir.1979). But the distinction between an employee and an independent contractor is easier stated than applied, and the line between them is sometimes indistinct. Nonetheless, courts are experienced in drawing such lines. Over the years, courts have developed several tests in the effort to distinguish employees from independent contractors. Under the common law standard, the determinative factor is the employer's "right to control" the putative employee's work, "not only as to the result accomplished by the work, but also as to the details and means by which that result is accomplished." *Smith v. Dutra Trucking Co.,* 410 F.Supp. 513, 516 (N.D.Cal.1976) (quoting *N.L.R.B. v.*

8. As noted, the text may not always support uniform treatment of the two provisions. *See* *supra* note 7; *infra* § III.

*Phoenix Life Ins. Co.*, 167 F.2d 983, 986 (7th Cir.), *cert. denied* 335 U.S. 845, 69 S.Ct. 68, 93 L.Ed. 395 (1948)), *aff'd*, 580 F.2d 1054 (9th Cir.1978). *See also Garrett v. Phillips Mills, Inc.*, 721 F.2d 979, 981 (4th Cir.1983). But in 1947, the Supreme Court rejected the common law "right to control" test as unnecessarily rigid for cases arising under the Social Security Act, and instead developed what has come to be known as the "economic realities" test. *Bartels v. Birmingham*, 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. 1947 (1947). Under this standard, "employees are those who as a matter of economic reality are dependent upon the business to which they render service." *Id.* at 130, 67 S.Ct. at 1550. Thus, the "economic realities" test broadens the definition of employee to include not only those whose employers maintain control over the details of their work, but also those in certain circumstances whose long-term, on-going business relationship with another renders them economically dependent on that relationship.

 In the context of Title VII litigation, however, most courts, including the Fourth Circuit, have adopted yet a third test for determining "employee" status. *Garrett,* 721 F.2d at 981–82 (applying third standard to ADEA case and recognizing its applicability to Title VII). First annunciated in *Spirides v. Reinhardt,* 613 F.2d 826 (D.C.Cir. 1979), a case decided under § 2000e–16, this test essentially combines the "right to control" and "economic realities" standards. Under this combined test, the employer's right to control the individual's work remains the most important factor. *Garrett,* 721 F.2d at 982. But it is not the only factor, nor is it dispositive. *Id.* Other relevant factors to be considered in the "employee vs. independent contractor" calculus include:

(1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by

a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; *i.e.,* by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.

*Spirides,* 613 F.2d at 832, *quoted in Garrett,* 721 F.2d at 982. *See also Mares v. Marsh,* 777 F.2d 1066 (5th Cir.1985) (applying *Spirides* factors to determine whether United States Army was plaintiff's employer under Title VII). Both the Navy and King agree that the *Spirides* standard provides the appropriate framework for determining King's employment status.[9]

 As noted, the most significant factor in determining employer status is whether the putative employer controlled the means and manner of the individual's work. *See Garrett,* 721 F.2d at 982; *Spirides,* 613 F.2d at 831; *Mares,* 777 F.2d at 1068. Given the importance of this factor, it is unsurprising that the Navy and King dispute the extent to which Lovett controlled the details of King's work for the SPAWAR contract at Booz–Allen. The parties submitted declarations containing opposing, and somewhat conclusory, statements regarding the working relationship between Lovett and King. For her part, King declares that she received "continuous supervision and direction" from Lovett and that he reviewed her work on a "near daily" basis.[10] On the other hand, the Navy

---

9. It is worth noting that the *Spirides* test was developed in a context where there was only one putative employer (that is, where the plaintiff was either the defendant's employee or not an employee at all). Despite this distinction, the parties correctly agree that the *Spirides* standard also provides the proper framework for analyzing the status of a putative co- or joint-employer.

10. Without greater specificity regarding the details of their working relationship, King's statements are inconclusive with respect to whether Lovett controlled the means and manner of her work. In the typical client-contractor relationship, the client will "review" the work performed by the contractor to determine whether it meets his expectations. In addition, while suggestive of

contends that while Lovett may have given assignments to Booz–Allen personnel, through Booz–Allen's project manager Dan Coole, it was always up to Booz–Allen to determine the best method and manner in which to complete the assignments. The Navy admits that Lovett periodically reviewed King's and other Booz–Allen personnel's work with respect to contract performance issues. But it denies that Lovett or any other Navy employee reviewed, or had the authority to review, King's individual job performance.

■ Of course, since the matter is before the Court on a motion for summary judgment, King's version of the facts must be presented "wherever the parties' evidence conflicts, at least to the degree that her allegations have support in affidavits, depositions, or other documentary evidence." *Paroline v. Unisys Corp.*, 879 F.2d 100, 102–03 (4th Cir.1989) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986)), *vacated and remanded in part en banc on other grounds*, 900 F.2d 27 (4th Cir.1990). Nonetheless, the party opposing summary judgment must "set forth *specific facts* showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e), *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (emphasis added), and purely conclusory allegations are insufficient to defeat a motion for summary judgment. *See, e.g., Martin v. Nannie & the Newborns, Inc.*, 3 F.3d 1410, 1418 (10th Cir.1993); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18

(2d Cir.1995); *Rivera–Cotto v. Rivera*, 38 F.3d 611, 615 (1st Cir.1994). Moreover, although the parties' *conclusions* regarding the extent of Lovett's control over King differ, a review of the more specific deposition testimony and documentary evidence on record provides a clearer picture of their working relationship and suggests that many of the actual *facts* are not actually disputed.

It is undisputed that the Navy was Booz–Allen's client, and that Lovett was King's primary client contact at the Navy. Also uncontested is the fact that Booz–Allen hired King and assigned her to the SPAWAR contract without input from the Navy. The Navy had no control over King's work schedule; Booz–Allen set her daily work hours and approved her vacation and medical leave. In addition, her direct supervisors were Booz–Allen employees: Dan Coole was her immediate supervisor, who in turn was supervised by Paul James. And, it is apparent from the record evidence that when Lovett acted inappropriately, King reported his behavior to, and sought advice from, her Booz Allen superiors.[11] Furthermore, King did not contact Navy upper-management directly regarding Lovett's behavior; rather, such meetings were arranged by Booz–Allen.

With respect to Lovett's direct interactions with King, the record reflects that Lovett met frequently with Booz–Allen staff to coordinate and review contract performance issues. Lovett's deposition testimony provides insight into the details of his interactions with King.

---

control, King's statement that Lovett "supervised" her work is also somewhat ambiguous. Presumably, any large government contract will be supervised to some extent by the relevant government agency. Yet, the word "employee" in § 2000e–16 clearly does not encompass every government contractor.

11. The interaction among these individuals is reflected in part in the EEO Counselor's report describing King's version of events:

1/91—Mr. Lovett asked Ms. King to lunch. She told him she would get back to him. She asked her immediate supervisor at BAH (Dan Coole) if she should go, Mr. Coole told her to go to lunch with Mr. Lovett....
2/91—Ms. King spoke with Mr. Coole and informed him of Mr. Lovett's inappropriate behavior; such as lewd comments. She told Mr.

Coole she wanted him to speak with Mr. Lovett about his behavior. Mr. Coole agreed to do so.

\* \* \* \* \* \*

9/92—Mr. Lovett informed Ms. King he had some good and bad news. The three day trip to California was canceled, but there would be one half day session they would be required to attend. She told him it was not cost effective to go for a half day session. Mr. Lovett told Ms. King to go anyway. During this time he would lick his lips. During this time, Mr. Coole was on vacation. Ms. King went to Mr. James (Coole's boss) and informed him she didn't want to go on the trip and explained Mr. Lovett's behavior up to this point. Mr. James to [sic] Ms. King to go on the trip and don't say anything.
(EEO Rpt., ¶ 9 attachment).

Q: Tell me, if you can, describe the kind of professional interaction that you had with Ms. King for the period of 1991.

A: Well, we would meet, you know, my dealings with Booz–Allen was [sic] quite frequent. I would say three or four times a week I would go over their [sic] office. We would meet in their team room. Working conditions were still in the old building. It still was kind of hard to deal with. I would spend a lot of time in their offices, their team room, their little conference room. I'd work with all the people there.... We would go over the various tasks at hand, who was doing what, the action item, we asked her to start tracking the action items, we asked her to start doing the financial plan and one of the things that we needed to do was coordinate with the financial planning people and we asked Stephanie [King], we kind of empowered her to go over on her own to NAVSEA, empowered her to go over there and deal with the people there.

(Lovett Tr., at 21–22) (internal paragraph breaks omitted). Generally, on the days that

Lovett went to Booz–Allen, he spent either a morning or an afternoon there, although occasionally he stayed an entire day. While Coole was Lovett's direct counter-part and primary contact at Booz–Allen, Lovett also met directly with King from time to time. And as the foregoing deposition testimony makes clear, he would delegate assignments when needed. Furthermore, when there were business trips involving the SPAWAR project, Lovett would dictate how many Booz–Allen employees could attend. However, it was then up to Booz–Allen to determine which specific employees filled those slots.[12] Thus, Lovett admittedly worked closely with King and other Booz–Allen personnel, and he played an active and integral role in overseeing their implementation of the SPAWAR project.

It is also plain that Lovett provided some input into King's performance reviews at Booz–Allen, although neither he nor the Navy performed formal reviews of her work. Booz–Allen apparently consulted Lovett before completing King's performance reviews, as her Booz–Allen "Performance Appraisal" form includes "clients" in the list of "sources of data" consulted.[13] While this input certainly affected King's job evaluations[14] and therefore influenced to some degree her sta-

---

12. During his deposition, Lovett was asked about an incident where King had been scheduled to attend a meeting in Hawaii but was subsequently excluded.

Q: Did you believe that Ms. King should have been in attendance at that meeting?

A: The original plan was for her to be there, yes. She had a definite job.

Q: What changed the plans?

A: What changed the plan was our Captain Price decided to go with us and we had an entourage we had too many people on the trip and I was afraid he was going to call me on the carpet for having too many people on the trip so at the last minute, probably two or three days before the trip I decided—I asked could we drop people and Ms. King and a male employee from another company was dropped from the list.

Q: At your recommendation?

A: At my recommendation. I did not recommend the people by name. I just recommended that we drop people from each company.

 * * * * * *

Q: But your testimony is that you didn't recommend to Mr. Coole that he disinvite Stephanie? He made that decision?

A: He makes all the decisions on matters in his company.

(Lovett Tr., at 65–68).

13. (Performance Appraisal, Pl.Ex. 8). Also included in this list are the employee herself, her assignment managers, and her peers. *Id.*

14. For instance, in one Performance Appraisal that was favorable overall, Booz–Allen notes that King "has not however, responded fully to the requests of the client to better proof her work, in which a simple editorial error (e.g., a wrong year on an installation schedule, errors in a fixed format funding requests) may have significant deleterious impact." (Performance Appraisal, Pl.Ex. 8, at 3).

tus and success at Booz–Allen, both parties agree that Lovett had no direct input regarding Kings' compensation, bonuses, or promotions. In addition, on a more informal level, Lovett would provide routine feedback to King and her supervisor, Dan Coole, regarding the quality of her work. He testified that although King's work was generally good, "[s]ometimes I'd get some work that was haphazard or, you know, half done and I'd complain about it to Mr. Coole and her. She would have to go back and re-do it." (Lovett Tr., at 25).

Thus, viewing the evidence in the light most favorable to King, it seems that Lovett had some influence over King's work product as well as the pace and direction of the overall project. It is also clear that if Lovett complained to King's Booz–Allen supervisors regarding her work, King's performance reviews might be affected. And while neither Lovett nor the Navy had the power to fire King, it is reasonable to conclude that if Lovett strongly objected to King's continued participation in the project, he could effectively persuade Booz–Allen to remove her.[15] This is especially true given the ever-present possibility that the Navy could simply take its lucrative business elsewhere.

██ Despite all of this, the totality of the circumstances, as reflected in the record evidence, nonetheless points persuasively to the conclusion that the Navy was not King's em-

ployer. The Navy simply did not maintain the sort of direct, supervisory control over the daily details of her work to render it her employer. Moreover, the remaining applicable *Spirides* factors point away from a conclusion that the Navy was her employer. Booz–Allen provided her work place, as well as all of her equipment and supplies. The Navy did not hire, train, or fire her, and other than her meetings with Lovett, she had little contact with Navy personnel. King's work involved a specific, isolated contract that Booz–Allen had with the Navy. Furthermore, King received no compensation, annual leave, or retirement benefits from the Navy, nor did the Navy pay her social security taxes. Finally, the only record evidence regarding the intention of the parties is an internal SPAWAR document stating that:

> all [support services] contracts must be structured and administered as non-personal services contracts. A non-personal services contract is a contract in which the personnel rendering the services are not subject, either by contractual terms or by manner of administration, to the supervision and control usually prevailing in relationships between the government and its employees.

(SPAWAR Inst., Def.Ex. 10, at ¶ 4.5.2.1.g.). While certainly not dispositive of the absence of an employer/employee relationship, the document signals the Navy's intent not to treat its SPAWAR contractors as employees.

> Q: Now, would it be possible for Stephanie King to still perform her responsibilities that she had been performing up to that point without direct contact with you?
> A: Yes.
> Q: By going through Mr. Coole?
> A: Yes. It would have made Mr. Coole's job a lot harder but it could have worked.
> Q: Basically any time—what you wanted was that any time Stephanie King had a question for you, that she ask the question of Mr. Coole and then Mr. Coole ask the question of you, you relay your answer to Mr. Coole?
> A: Or put it in writing. That's the formal relationship that is by the book we call it.
> (Lovett Tr., at 70–71). Reading this testimony in the light most favorable to King, it is a reasonable inference that Lovett's request in this regard contributed to Booz–Allen's decision to transfer her to another, less desirable position.

---

**15.** Although the Navy contends that King requested to be taken off the project, King denies making such a request and claims that she was removed from the project "upon the request of Mr. Lovett." (King Decl., ¶ 7). While King cannot testify to matters beyond her personal knowledge, *Goenaga*, 51 F.3d at 18, there is some support for such an inference in the record. The record reflects that in April 1993, Randolph Bricker, a Vice President at Booz–Allen, wrote a letter conveying King's complaints regarding Lovett to Robert McLaughlin, an upper-level manager at SPAWAR. Shortly after this, Lovett told Coole that he was "uncomfortable" working directly with King and requested that they "formalize" their relationship. (Lovett Tr., at 69–70). In his deposition, Lovett explained what he meant by "formalize":

> Q: What do you mean by that?
> A: That I didn't want to have any direct dealings with her. I would rather work through Mr. Coole, work through him and receive deliverables from him.

■ Although control is the most important individual factor in determining whether an employment relationship exists, the totality of circumstances must be considered. And, in this regard, it is important to recognize that *all* clients maintain some degree of control over the work of a hired independent contractor, although there is clearly a continuum. At one end of the continuum is the traditional employer/employee relationship, where a company hires a salaried employee, such as an engineer or secretary, to work full-time, and the company controls his or her assigned projects, work place, and schedule. At the polar opposite end of the continuum is the standard client/independent contractor relationship, such as the association between an automobile owner who drops her vehicle off with the auto mechanic in the morning and picks it up when the work is completed in the afternoon. There, while the automobile owner maintains some control over the results to be accomplished, she maintains virtually no control over the details of how the work is performed. The auto mechanic is plainly an independent contractor, and the vehicle owner her client.

Somewhere in the middle of this continuum, but closer to the employer/employee end, may be found the temporary secretary hired by a company for a period of several months. While the company does not pay his wages and is not a permanent employer, it maintains such exclusive control over the temporary secretary's work assignments and so integrates him into its work environment that it could, in certain circumstances, be considered his employer. Also in the middle of this continuum, but tending toward the opposite pole, is the corporation that hires a law firm for representation in litigation. There, the client is involved much more intimately with decision-making and performance issues, yet a law firm attorney working with a client is nonetheless an independent contractor and not an employee of the client corporation.

King's relationship with the Navy seems quite similar to this last example. Like Lo-vett, the client may meet frequently with firm lawyers to discuss litigation strategy and even delegate particular matters to be researched. Similarly, if the litigation is large and complex, a firm associate may find herself spending all of her time on that one client's project. Moreover, if the client were dissatisfied with her work, it may request that another of the firm's attorneys take over the litigation. Such a request, of course, may adversely affect the attorney's career and chances for advancement at the firm. Or, if a client representative were to make inappropriate sexual advances toward the attorney and she complained to firm management, the firm might be reluctant to upset a lucrative client and therefore decide, inappropriately perhaps, to remove her from the project rather than to confront the client concerning the offending client employee. Notwithstanding the client's frequent interaction with the firm associate, its control over the work she receives, and its indirect influence over her success at the firm, the corporate client in that instance would simply not be the attorney's employer for Title VII purposes. There, as here, the totality of the circumstances points persuasively toward the conclusion that the client has not so transcended the bounds of client-contractor relationship as to become her employer.

Contesting this result, King relies heavily upon this Court's ruling in *Magnuson v. Peak Technical Services*, 808 F.Supp. 500 (E.D.Va.1992), where a Title VII sexual harassment plaintiff claimed three employers: Peak, Volkswagen, and the Fairfax Volkswagen dealership.[16] But *Magnuson* is factually distinguishable and ultimately not controlling here. In *Magnuson*, the plaintiff was officially hired by Peak, a company that provided field marketing specialists and manufacturer's representatives for Volkswagen. She became a field marketing specialist and initially spent her days visiting various different Volkswagen dealerships to monitor their sales and marketing of Volkswagen vehicles. Sometime thereafter, she was promoted to a position as a manufacturer's representative,

---

**16.** *Magnuson* was decided under § 2000e–2, not § 2000e–16. Given the conclusion that both provisions permit multiple employers for one aggrieved employee, however, *Magnuson* is not distinguishable on that ground.

which required her to work full time at the Fairfax Volkswagen dealership.

But while the plaintiff in *Magnuson* was actually hired by Peak, it was Volkswagen, not Peak, that initially interviewed her for the job. Indeed, the record showed that Volkswagen *directed* Peak to hire her. In addition, while Peak paid the plaintiff's salary and benefits, Volkswagen provided all of her training and direct supervision. And due to the nature of her job, the plaintiff spent her working days at Volkswagen, not Peak, offices. Moreover, it was Volkswagen, not Peak, that eventually promoted her to a position as a manufacturer's representative at the Fairfax Volkswagen dealership. Finally, the contract between Volkswagen and Peak contemplated that Volkswagen would maintain some control over the basic conditions of the plaintiff's employment. For instance, Volkswagen controlled her hours, signed her weekly time sheet, and reported to Peak if she was absent from work. In these circumstances, the Court held that a jury could reasonably find that Volkswagen was the plaintiff's employer for Title VII purposes. *Id.* at 509.

The Court also ruled that the Fairfax Volkswagen dealership could be her *de facto* employer. Once the plaintiff in *Magnuson* became a manufacturer's representative, she worked exclusively on the premises of the dealership. As a result, she worked closely with the dealership's personnel, attended sales meetings there, and was supervised by the dealership's general manager. The evidence also suggested that the floor manager kept track of her hours. She was, in effect, fully integrated into the dealership's working environment. Given this, there was a material issue of fact regarding whether the Fairfax Volkswagen dealership was her employer under Title VII.

Evident in *Magnuson* is that the "employers" there maintained much greater and more active control over the plaintiff's work schedule, duties, and environment, than did the Navy in the case at bar. Unlike the Navy here, Volkswagen in *Magnuson* interviewed and selected the plaintiff. In addition, both Volkswagen and the dealership provided her place of work, scheduled her hours, supervised her directly, trained her, and promoted her. In other words, except for the absence of an employment contract and direct payment for services, the relationship between the defendants there and Ms. Magnuson bore almost every indicia of an employer/employee relationship. Furthermore, like a temporary employment agency, *see Amarnare*, 611 F.Supp. at 347–49, and unlike Booz–Allen here, Peak relinquished daily supervision over the plaintiff to Volkswagen and the dealership, maintaining no control over or direction regarding the details of her work. In this respect, Volkswagen and the dealership had many attributes of an employer's control that Peak, the employer with whom she was in contractual privity, did not. The absence of these factors in this case significantly distinguishes *Magnuson* from the case at bar, and indeed, makes clear that King's relationship with the Navy is that of a contractor/client.[17]

### III.

▮ In addition to the Navy, King sued Lovett in both his individual and official capacities for sexual harassment under Title VII. Lovett moves to dismiss on the ground that he is not an employer and therefore not subject to suit under § 2000e–2 or § 2000e–16. King opposes the motion, claiming that Lovett meets the statutory definition of "employer", which definition includes "agents" of

---

17. It is worth noting that were the economic realities test the proper standard for Title VII cases in this circuit, the result may well be different. For it is clear in a pragmatic sense that King's occupational stability, like that of many contractors, depended in large part on the continued willingness of the Navy to contract with Booz–Allen and to approve of her work. *See Hill v. New York City Bd. of Educ.*, 808 F.Supp. 141, 146–48 (E.D.N.Y.1992) (applying economic realities test to conclude that school bus driver employed by bus company was also employee of city Board of Education since Board had "exclusive power to certify" him to drive on school bus routes and since Board "indirectly exercised significant control over [his] work" through regulations and policies). But the Fourth Circuit, like most jurisdictions, has not adopted such a lenient standard in the Title VII realm. *Garrett*, 721 F.2d at 981. Under the hybrid *Spirides* test, the Navy was not King's employer, and its motion to dismiss must be granted.

employers.[18] Given the foregoing ruling that the Navy was not King's employer, however, Lovett's status as the Navy's agent does not render him her employer in this instance, and Lovett's motion to dismiss must be granted.

 Alternatively, even if the Navy were King's employer, section 2000e–16 explicitly states that for suits brought pursuant to its provisions, "the head of the department, agency, or unit, as appropriate, shall be the defendant." § 2000e–16(c). Because § 2000e–16 is the exclusive Title VII provision governing suits against the federal government, *see supra* § II.A., it is clear that for governmental liability, the Secretary of the Navy, in his official capacity, is the only proper defendant. Thus, the motion to dismiss King's claim against Lovett in his official capacity must be granted on this ground as well.

This raises the question whether § 2000e–16 also precludes Title VII suits against federal government employees as individuals. While the statute does not explicitly address this issue, the Supreme Court has broadly stated that § 2000e–16 "provides the exclusive judicial remedy for claims of discrimination in federal employment." *Brown*, 425 U.S. at 835, 96 S.Ct. at 1969. In addition, courts that have considered this issue have uniformly held that individual federal employees may not be sued for employment discrimination under Title VII. *See Person v. United States Dept. of Agric.*, 593 F.Supp. 1054, 1059 (E.D.Wis.1984) (stating that in Title VII suit involving discrimination in the federal workplace, it is "axiomatic" that "[t]he proper party defendant is the pertinent agency head, not his or her various employees"). *See also Pierce v. Runyon*, 857 F.Supp. 129, 131 (D.Mass.1994); *Beasley v. Griffin*, 427 F.Supp. 801, 803 (D.Mass.1977); *Ellis v. United States Postal Serv.*, 784 F.2d 835, 838 (7th Cir.1986); *Newbold v. United States Postal Serv.*, 614 F.2d 46, 47 (5th Cir.), *cert. denied*, 449 U.S. 878, 101 S.Ct. 225, 66 L.Ed.2d 101 (1980). Therefore, dismissal of the Title VII claim against Lovett in his

individual capacity is also appropriate on this ground.

### IV.

For the foregoing reasons, the motions to dismiss will be granted. An appropriate order shall issue.

---

**18.** Specifically, § 2000e(b) defines "employer" to be "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or proceeding calendar year, and any agent of such person."