Carol SIBBALD, Plaintiff,

v.

Hansford T. JOHNSON, Acting
Secretary of the Department
of the Navy, Defendant.

No. 02CV2186JM(JMA).

United States District Court,
S.D. California.

Dec. 1, 2003.

Joel C. Golden, Esq., San Diego, CA, for
Plaintiff.

Tom A. Woods, Esq., Special Assistant
U.S. Attorney, San Diego, CA, for Defendant.

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

MILLER, District Judge.

Defendant moves to dismiss the complaint or, in the alternative, for summary judgment on the ground that Plaintiff is not a federal employee within the meaning of Title VII. Plaintiff Carol Sibbald opposes the motion. Pursuant to Local Rule 7.1(d)(1) this matter is appropriate for decision without oral argument. For the reasons set forth below, the court grants Defendant's motion for summary judgment.

## BACKGROUND

On November 5, 2002 Plaintiff commenced this action against the Secretary of the Navy ("Navy") alleging that she suffered work-place gender discrimination, retaliation, and due process violations all in violation of Title VII. Plaintiff alleges that an employee of Defendant, Rodolfo Recaido, "subjected her to sexually offensive conduct including continuous pressure to take her out on a date and on October 24, 2000 he kissed her without her consent." (Compl.¶ 6). Plaintiff allegedly complained to her supervisors and, on November 13, 2000, she was terminated. The

following facts complement the complaint's allegations and are taken from the evidentiary submissions of the parties.

In June 1999 the General Services Administration ("GSA") entered into a contract with Anteon Corporation ("Anteon") for the provision of automation services to the Naval Computer and Telecommunications Station ("NCTS"). Under the Task Order at issue, Anteon was to provide administrative support to NCTS's Comptroller Department. (Wells Decl. ¶ 7). One function of the Task Order required Anteon to provide administrative assistance involving distribution of mail, mailing letters and reports, updating addresses in a computer database, answering phones, inputting information into a spreadsheet and filing documents. (Exh. I at § 2.1.3).

After Plaintiff applied for a position with Anteon, on December 6, 1999 Plaintiff's supervisor, Anteon employee Greg Bryan, presented Plaintiff's resume to GSA as a proposal to fill an opening for a data entry clerk position. Plaintiff also acknowledged Anteon's policies with respect to affirmative action and sexual harassment which required the employee to contact Anteon's Human Resources office or the employee's supervisor or manager.

The position for which Anteon submitted Plaintiff's resume was left vacant because Anteon had moved the prior employee to another position. Anteon also downgraded Plaintiff's position from a SL–05 skill level to a SL–09 skill level because, in part, Plaintiff did not have a security clearance which could be a six month process to complete, the Task Order was anticipated to last for only a limited time, and the tasks under the order could have been completed by the time security clearances were approved. (Exh. J). Anteon set Plaintiff's work schedule, paid Plaintiff's salary, and provided benefits to Plaintiff. On February 16, 2000, Plaintiff received a letter from Anteon notifying her that it was unable "to provide you with continuing employment beyond February 16, 2000. This action is due to a loss of funding/tasking for your position and we have been unable to secure an alternative opportunity for you." (Exh. V).

On November 13, 2000 Plaintiff contacted a Navy Equal Employment Opportunity ("EEO") office and alleged an ongoing pattern of sexual harassment carried out by a civilian employee at NCTS. The Navy received Plaintiff's formal EEO complaint on December 12, 2000 and, on January 22, 2001 the agency dismissed the complaint on the ground that Plaintiff was not a Navy employee, but an employee of Anteon, an independent contractor. On June 27, 2002 the Equal Employment Opportunity Commission ("EEOC") vacated the Navy's dismissal letter and remanded the case with directions to supplement the record. After gathering supplementary evidence, on August 12, 2002, the Navy issued a new final decision, again dismissing the complaint for failure to state a claim. It is unclear from the record whether the EEOC has ever made a determination on the merits of Plaintiff's claims. On November 5, 2002 Plaintiff commenced the present action.

## DISCUSSION

### Legal Standards

A motion for summary judgment shall be granted where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *British Airways Bd. v. Boeing Co.,* 585 F.2d 946, 951 (9th Cir.1978), *cert. denied,* 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979). The moving party bears the initial burden of informing the court of the basis for its motion and identifying those portions of the file which it believes demonstrates the absence of a genuine issue of

material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). There is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* (emphasis in original). The opposing party cannot rest on the mere allegations or denials of a pleading, but must "go beyond the pleadings and by [the party's] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. at 2553 (citation omitted). The opposing party also may not rely solely on conclusory allegations unsupported by factual data. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989).

The court must examine the evidence in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). Any doubt as to the existence of any issue of material fact requires denial of the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). On a motion for summary judgment, when "'the *moving party* bears the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence were uncontroverted at trial.'" *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir.1992) (emphasis in original) (quoting *International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264–65 (5th Cir.1991), *cert. denied*, 502 U.S. 1059, 112 S.Ct. 936, 117 L.Ed.2d 107 (1992)).

**The Motion**

■ The parties do not dispute that Plaintiff may maintain a Title VII claim against the Navy only if she is an employee of the federal employer. *See* 42 U.S.C. § 2000e–16. Similarly the parties do not dispute that an employee may have more than one employer for purposes of Title VII. In order to determine whether Plaintiff is a Title VII employee of the Navy, the court must first identify the legal standard that applies to the claim of an individual who does not have a direct employment relationship with the employer. The Ninth Circuit has yet to determine which of the following three possible tests applies to the present circumstances. *See Lopez v. Johnson*, 333 F.3d 959, 963 (9th Cir. 2003) ("We need not, however, decide between these tests because it is clear in this case that Lopez was not a federal employee under either test."). The first test is the common law agency test, recently applied by the Ninth Circuit in a non-Title VII case. *See Vizcaino v. United States District Court for the Western District of Washington*, 173 F.3d 713 (9th Cir.1999). The second is the multi-factor common law hybrid test which combines the common law agency test with an "economics realities" test and was adopted by the D.C. Circuit in *Spirides v. Reinhardt*, 613 F.2d 826 (D.C.Cir.1979). The focus of the "economic realities" test is whether the employee, as a matter of economic reality, is "dependent upon the business to which they render service." *Bartels v. Birmingham*, 332 U.S. 126, 129, 67 S.Ct. 1547, 91 L.Ed. 1947 (1947) (applying the economic realities test to cases arising under the Social Security Act). The third test centers on the extent to which an employer retains control over the terms and conditions of employees employed by the independent contractor. *See NLRB v. Browning–Ferris Industries of Pennsylvania, Inc.*, 691 F.2d 1117, 1123 (3d Cir.1982).

In *Lopez*, the Ninth Circuit noted that the "multi-factor common law hybrid test is ill-suited for determining whether an individual, who is indisputably an employee of an independent contracting entity that provides employees to perform services for the government, is also an employee of the

government." 333 F.3d at 963. The Ninth Circuit analyzed the joint employer issue by focusing on the control exercised by the government over the terms and conditions of Lopez's employment. In rejecting Lopez's claim that he was also a federal employee, the court noted that the independent contractor "was solely responsible for hiring and training Lopez" and "maintained its own supervisors on site." *Id.* The court also noted that Lopez "was required to report to [the independent contractor's] supervisors, not to [government] personnel, if he were sick or late." *Id.* Based upon these facts, the Ninth Circuit concluded that the federal government "did not retain for itself sufficient control of Lopez under the joint employer test to be deemed his employer together with" the independent contractor. *Id.* at 963–64.

■ Other authorities indicate that the degree of control over an independent contractor's employee, while significant is not dispositive. Other relevant factors include:

> (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner is which the work relationship is terminated . . . ; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the worker accumulates retirement benefits; (1) whether the "employ-

er" pays social security taxes; and (11) the intention of the parties.

*Spirides,* 613 F.2d at 832.[1]

The Navy comes forward with the following evidence to establish that Plaintiff was not a federal employee. Plaintiff was hired and fired by Anteon; Anteon required that Plaintiff conform to the NCTS's work schedule and hours; Anteon set Plaintiff's skill level; Anteon paid Plaintiff's salary and benefits; Plaintiff reported her time to Anteon; Plaintiff requested leave from Anteon, not the Navy; Plaintiff was enrolled in Anteon's retirement plan; Plaintiff continued to work for Anteon after she stopped working at the NCTS site; Plaintiff specifically acknowledged that she was subject to Anteon's employment policies and procedures, and Anteon prepared Plaintiff's work performance evaluations. The record also establishes that Anteon and the Navy did not intend to create a joint employment relationship and that the Task Order was for a limited period of time. (Wells Decl. ¶ 7). In the event of a deficient performance by an Anteon employee, the Navy would not implement plans to improve the individual's performance but would look to Anteon to take such action as required. (Watkins Decl. ¶ 7, 11). In short, Plaintiff's connection with Anteon demonstrates all the indicia of a traditional common law employment relationship. Further, as a matter of economic reality, Plaintiff was dependent upon her continued employment relationship with Anteon, and not the Government. When the short-term position reached its contemplated end, Plaintiff, like other Anteon employees who preceded her, was dependent upon Anteon to be placed in another position for continued employment. In light of this evidence, the Navy

---

1. Plaintiff urges the court to adopt and apply EEOC guidelines applicable to staffing contracts as the appropriate legal standard. The court rejects this notion as Plaintiff fails to cite a single authority that has applied this standard outside of staffing contracts.

has met its summary judgment burden and Plaintiff must come forward with evidence to show that there is a genuine issue of material fact with respect to joint employment.

Plaintiff seeks to raise genuine issues of material fact by showing that (1) the Task Order itself identifies the scope of her employment and (2) the Navy exercised actual control over her employment. First, Plaintiff relies in part upon the Task Order to conclude that the Navy controlled all material aspects of her employment. The Task Order generally provides for the hours of operation, specific job tasks and duties, and the requirements for security clearances. (Wells Decl. ¶ 7: Exh. I). Plaintiff correctly points out that the Task Order identifies the primary duties over the terms of her employment and evidences the significant control of the Navy over the tasks and duties to be performed. While the Task Order indisputably identifies the employment duties of the position occupied by Plaintiff, the Task Order was a contract document between Anteon and GSA, and not between GSA and Plaintiff.

The difficulty with giving the Task Order great weight is that virtually every contractor employee or independent contractor would become the agent or employee of the government simply by means of contract. Although such a consideration "would have more resonance in a legislative hearing than in a judicial proceeding," *Lopez*, 333 F.3d at 964, Plaintiff has offered no practical limitation to the legitimate question of whether all employees of independent contractors would become government employees if a governmental employee where to define tasks for or exercise any supervision or control over the independent contractor's employee. In this case, where the primary functions and duties of the independent contractor's employee are defined by contract, the various identified tests are not readily applicable to the present circumstances because the primary focus is on the putative employer's right to control the means and manner of the employee's performance. Where the means and manner of the employee's performance are almost entirely controlled by contract or Task Order, the traditional tests are not particularly helpful. Accordingly, the court concludes that the Task Order does not provide a substantial basis to establish a putative employment relationship between Plaintiff and the Navy.

Second, Plaintiff contends that the Navy is a joint employer because it supervised her performance and exercised substantial control over her work place duties. Plaintiff declares that the "Navy determined and assigned me my schedule and specific hours of work, work location, job duties and tasks, breaks and provided me with all of the necessary equipment and facilities to perform my job." (Sibbald Decl. ¶ 2). The court observes that these are essentially the same tasks identified in the Task Order and do not establish the requisite degree of control to establish a joint employment relationship. (Exh. I, Wells Decl. ¶¶ 7–9). With respect to supervision of her day-to-day activities, Plaintiff declares that the Navy supervised her approximately 80% of the time and Anteon about 20% of the time. (Sibbald Decl. ¶ 9). Plaintiff declares that her typical day began with her requesting of Susan Watkins, a Supervisory Contracting Officer at NCTS, "what tasks I should do that day. Then I would go back to my desk and do my work and Ms. Watkins would periodically check on me every few hours to monitor what I was doing and request I do additional tasks. Other Navy employees and supervisors also requested that I do certain tasks throughout the normal workday." (Sibbald Decl. ¶ 10).

The court concludes that Plaintiff's general statement that she was supervised 80% of the time by the Navy and 20% by Anteon fails to establish a genuine issue of material fact sufficient to conclude that she was an employee of the Navy for purposes of Title VII. In *Brug v. National Coalition of the Homeless,* 45 F.Supp.2d 33 (D.D.C. 1999), the plaintiff sought to impose Title VII liability against the U.S. Department of Housing and Urban Development ("HUD") and others. Based upon HUD's agreement with an independent contractor, plaintiff sought to impose liability on the government for the control exercised by HUD over her employment with the contractor. In support of her claim, plaintiff submitted an affidavit declaring that HUD "directed, critiqued, defined and approved every major aspect of [her] work." The court held that the declaration was insufficient as a matter of law to raise a genuine issue of material fact because the declaration "did not list specific facts in support of her sweeping claim that [HUD] directed and controlled every aspect of her work." *Id.* at 38. The court noted that the contractor paid plaintiff's salary, insurance, retirement benefits, and provided sick and annual leave benefits. Plaintiff also acknowledged the contractor's personnel manual and noted that her direct supervisor was employed by the contractor. The court also focused on evidence that HUD did not have the authority to hire or fire plaintiff.

While the evidentiary record provides some evidence to support Plaintiff's claim that the Navy supervised some of her work and provided guidance on the performance of the tasks, Plaintiff's declaration establishes that she was almost exclusively engaged in performing the activities and job responsibilities identified in the Task Order. This evidence is insufficient to create a genuine issue of material fact.[2] As noted in the context of an analogous Title VII claimant seeking to impose liability on the government:

> In the typical client-contractor relationship, the client will "review" the work performed by the contractor to determine whether it meets [its] expectations. In addition, while suggestive of control, ... [a] statement that [a federal employee] "supervised" her work is also somewhat ambiguous. Presumably, any large government contract will be supervised to some extent by the relevant government agency. Yet, this word "employee" in § 2000e–16 clearly does not encompass every government contractor.

*King v. Dalton,* 895 F.Supp. 831, 838–39 n. 10 (E.D.Va.1995). In *King,* the plaintiff declared that the government provided "continuous supervision and direction" and reviewed her work on a daily basis. *Id.* at 838. The plaintiff also established that the Navy supervisor had influence over the plaintiff's work product, pace, and direction of plaintiff's project; the Navy supervisor could impact the plaintiff's performance reviews; and the Navy supervisor could influence the independent contractor's decision to remove the plaintiff from the project. Despite this specific evidence of control over plaintiff, the court noted that the "Navy simply did not maintain the sort of direct, supervisory control over the daily details of her work to render it her employer," *id.* at 841, and concluded that "the totality of the circumstances points persuasively to-

---

**2.** The court also rejects Plaintiff's contention that the requisite employment relationship is established because she worked at the NCTS site and used materials and equipment provided by the Navy. *See Lopez,* 333 F.3d at 963 (the fact that an employee of an independent contractor worked in Navy offices and used Navy supplies and equipment did not establish the Navy's control over the terms and conditions of plaintiff's employment).

ward the conclusion that the client has not so transcended the bounds of client-contractor relationship as to become her employer." *Id.* at 842.

Plaintiff's hurdle is to establish, not whether some evidence supports a finding that the Navy supervised a portion of her work (in almost all instances the government exercises some degree of supervisory control over its independent contractors) but, whether the degree of supervision and control over the material terms, means and conditions of Plaintiff's employment points to the conclusion that the Navy was her employer. Where the right to control the employment-related tasks of an independent contractor's employee arises from a contract with an independent contractor, the contractor's employee bears a particularly difficult burden. Here, the overwhelming evidence demonstrates that the Navy did not maintain the type of direct supervisory control over Plaintiff's terms and conditions of employment to render the Navy Plaintiff's Title VII employer. The critical hallmarks of an employment relationship do not exist: the Navy could not hire or fire Plaintiff; Plaintiff's payroll package and benefits were the responsibility of Anteon; any requests for leave had to be made to Anteon; Anteon maintained a direct supervisor on site; the job responsibilities and duties carried out by someone in Plaintiff's position were defined in the Task Order; the position filled by Plaintiff was a short-term one, previously filled by another Anteon employee; and Plaintiff acknowledged the employment policies of Anteon.

In sum, the court grants the Navy's motion for summary judgment. The Navy has persuasively established under the totality of the circumstances that Plaintiff is not its employee for purposes of Title VII.

The Clerk of Court is instructed to close the file.

**IT IS SO ORDERED.**